*In Re: Michael White, USCA 26-1042, On Petition for a Writ of Mandamus*
*Related to: Boshea v Compass*, Case 1-21-CV-00309-ELH (D. Md.) - ECF 387



**NOV 1 7 2025**

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DEPOSIT BOX

UNITED STATES DISTRICT COURT
for the District of Maryland

ASHLEY BOSHEA as Administrator of the Estate of DAVID JOHN BOSHEA,

Plaintiff

V.                                          Civil Action No. 1-21-CV-00309-ELH

COMPASS MARKETING, INC.,

Defendant

---

### MICHAEL WHITE'S MOTION FOR RECONSDIERATION UNDER RULE 59(e)

(Request for Hearing)

---

Michael White, herein referred to as Movant, respectfully requests from the Honorable

Court to reconsider its order contained in Docket No. 386, and the related Memorandum Opinion

in Docket No. 385. In support of this motion, Movant states, alleges, and prays:

### INTRODUCTION

Movant respectfully suggests that John White and Mr. Stern do not, and never have,

either legally or genuinely represented Compass Marketing, Inc. They have only represented

their own personal interest in Smart Retail, Inc., a business they started together in 2019. ECF

33-1 at 1. The Court's Memorandum Opinion in Docket No. 385 (herein referred to as the

Memorandum Opinion) indicates in several places that John White and Mr. Stern have so

successfully obfuscated the ownership of Compass that the Court incorrectly recounts "Daniel

and Michael White *may be* part owners of Compass" ECF 385 at FN 3 and "Compass and *its*

*owner* and CEO, John White" ECF 385 at 1. Every party in this case has consistently maintained

1

over five years that Compass is owned by John White, Daniel White and Movant. While at one time there may have been a dispute alleged as to the amount of Compass that Movant owns, there has never been a suggestion that Movant is not a Compass shareholder. Moreover, the August 21, 2025, judgment in favor of Movant by the Honorable Robert Thompson sitting in the Circuit Court for Anne Arundel County, Maryland [1] now resolves that Daniel White and Movant together own 50% of Compass Marketing.

The consequences of John White and Mr. Stern masquerading as representatives of Compass have been profound and caused injury far beyond even the significant legal fees incurred by Movant. The manner in which John White and Mr. Stern have conducted this litigation has also damaged Compass, causing our business to owe millions of dollars in punitive damages, interest, costs, and attorney fees (both plaintiff and defense) that would have been avoided by simply paying the severance we agreed to in 2007, or settling the case for some reasonable amount. John White and Mr. Stern have instead used the last five years to pay themselves here and their fellow lawyers in the "unrelated" lawfare enormous amounts. Now, because of their conduct, when the Court enters the order for Mr. Boshea's children that is long overdue, it will not be worth the paper it is written on.

The most critical damage, outweighing all others, of allowing John White and Mr. Stern to pretend to represent Compass in the manner they chose was irreparable harm to David Boshea and his family. Instead of giving Mr. Boshea the severance we agreed we would pay, they used this case as part of their lawfare against Movant and Flywheel. During the five years John White and Mr. Stern were allowed to drag this case out, and because of their unilateral and corrupt decisions, severe injury was caused to Mr. Boshea's family

---

[1] *Compass Marketing, Inc. v. Daniel White et al.*, No. C-02-CV-23-000601 (Md. Cir. Ct. Anne Arundel Cnty. 2023).

2

bonds and to his own health. In Movant's opinion, John White and Mr. Stern's behavior while pretending to represent our company directly contributed to Mr. Boshea's despair, leading to his sad and early demise.

## STANDARD FOR MOTION FOR RECONSIDERATION

A motion for reconsideration is the appropriate vehicle to correct manifest errors of law or fact, present newly discovered evidence, or when there is an intervening change in the law. Generally, a motion for reconsideration is an extraordinary remedy that should be used sparingly. According to professors Wright and Miller, there are four basic grounds upon which a Rule 59(e) motion may be granted, namely:

"First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based. Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary to prevent manifest injustice. Serious misconduct of counsel may justify relief under this theory. Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law". 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 at 124-27 (2d ed. 1995) (footnotes omitted).

## DISCUSSION

Mr. Stern is not a genuine or legal representative of Compass. Rather, Mr. Stern has been consumed with his connection with John White and their "one-penny RFID" electronic shelf labels side business, known as Tagnetics, Inc. and Smart Retail, Inc. (herein referred to as Tagnetics and Smart Retail). [2] As the Court notes in its Memorandum Opinion, on August 23,

---

[2] On June 2, 2021, Mr. Stern filed Compass Marketing, Inc.'s (herein Compass) Disclosure of Corporate Affiliations wherein they falsely allege: *"Tagnetics, Inc., is an affiliate of Compass*

3

2021, "Michael requested a hearing to determine the legitimacy of [Mr. Stern's] appearance in this case," and Movant has done so consistently ever since, including within his motion for sanctions. No such hearing was ever granted. Moreover, there is no record in this case that indicates the Court ever considered Movant's request or otherwise initiated an inquiry into Mr. Stern's authority to appear on behalf of Compass or ordered Mr. Stern to demonstrate his authority to represent Compass by providing retainer agreements, corporate resolutions, or personal confirmation from a managing agent of Compass.

John White is not the "CEO" and is not a managing agent of Compass. As shown by Daniel White's April 28, 2025, letter to Judge Garcia ECF 338 and by the public records of the Virginia State Corporation Commission, John White resigned as the Chief Executive Officer of Compass not later than October 2021. ECF 338. In a later opinion, this Court notes from that letter:

> "Daniel White asserts that "John White is not, and has not been, the Chief Executive Officer of Compass Marketing, Inc. at least since his resignation in 2021." Id. (emphasis in ECF 338). To support this contention, Daniel White attached "filings made with the Virginia State Corporation Commission" and an update to Compass's website. Id. at 2; see id. at 3–5. The filing is a "Stock Corporation – Annual Report" for Compass, submitted to the Virginia State Corporation Commission on March 7, 2022. ECF 338 at 3. Notably, it lists John White as the "Owner" of Compass and P. Todd Mitchell as the "Chief Executive Officer." Id. Moreover, the exhibit includes a "Q+A" with the "new CEO," Todd Mitchell. Id. at 4." ECF 340 at 8.

_____

*Marketing, Inc., under the laws of certain states. To this end, Compass Marketing owns at least 10% of the shares and options of Tagnetics, Inc."* ECF 017. That "disclosure" was simply designed as cover for John White and Mr. Stern looting the accounts of Compass to satisfy the disgruntled investors in Tagnetics.

Despite the Court having received information and public records at the Virginia State Corporation Commission *made by John White* that raise doubts about John White's status as a legal or genuine managing agent of Compass, there is no record in this case that indicates the Court ever initiated an inquiry into John White's authority to appear on behalf of Compass or ordered John White to demonstrate his authority to represent Compass by providing minutes of shareholder or board meetings, corporate resolutions, or personal confirmation from another managing agent of Compass.

There is good cause to find that Movant's motion for sanctions was timely filed. The Court's record contains sufficient information to find good cause for Movant's timing in filing a motion for sanctions. For seven years, John White and Mr. Stern have constantly attacked Movant's family members as a means of general retaliation and an attempt to gain illegitimate leverage in this Boshea case, and the related Flywheel case and Maryland Case. In Maryland Case, on January 8, 2025, John White and Mr. Stern maliciously added Movant's wife, Debra White, as a defendant in that malicious lawsuit, after having already involved both of his children in their lawfare. When the Honorable Robert Thompson had an opportunity to address that despicable move, he dismissed the allegations against Debra White with prejudice and ordered sanctions against the offending parties, including counsel, for such an outrageous and meritless attack.

In this Court, by contrast, John White and Mr. Stern were permitted to maliciously add Movant's wife (and son) to Compass's witness list - and keep her listed for over two years. See ECF 173 (Jun 6, 2023) and ECF 348 (Aug 8, 2025). Counsel and the Court reviewed the witness list multiple times, yet at no point did anyone question John White or Mr. Stern as to why Movant's wife was added. Debra White's name had never appeared in

5

years of Compass's pretrial activity. Debra White has never met David Boshea and has no knowledge of the terms of his employment with Compass. Movant's wife was not added for any legitimate reason; rather, it was a tacit threat by John White and Mr. Stern to further target Movant's family by requiring his wife to wait in the hallway of the Baltimore federal courthouse throughout a two-week trial. Movant's wife had already been subject to attacks from John White and Mr. Stern, so Movant deferred filing his request for sanctions until after the trial concluded. ECF 173; ECF 348.

The second reason for delaying the sanctions request, as reflected in the Court's memorandum, was Movant's inability to incur additional legal fees during trial while already simultaneously bearing significant expense defending the malicious RICO litigation orchestrated by John White and Mr. Stern in the Flywheel matter before the United States District Court for the District of Maryland, and the illegitimate copycat in Anne Arundel County. Moreover, Movant expected that he would need to proceed pro se in the sanctions motion, as the legal profession generally discourages attorneys from seeking sanctions against opposing counsel even where justified. Movant did not wish to place prior counsel in the uncomfortable and professionally awkward position of requesting sanctions against fellow members of the bar.

The third-party complaint did indeed have a bearing on Movant. The third-party complaint was not only baseless, but malicious. Movant was identified in the complaint as plainly as possible without direct reference to his name, with allegations that Mr. Boshea received bi-weekly payroll payments totaling $51,800 to which he was not entitled. John White and Mr. Stern specifically claimed that Movant alone controlled the payroll system that allegedly resulted in these overpayments to Mr. Boshea. It is nearly impossible to

6

interpret the complaint as targeting anyone other than Movant and Daniel White as the alleged wrongdoers. Throughout the Boshea litigation, as well as in the Flywheel and Maryland cases, John White and Mr. Stern repeatedly accused Movant of similar misconduct. Like Mr. Tollefson's ridiculous "emergency" withdrawal on the eve of the first *Boshea* trial, this was a calculated effort to serve a malicious end - deterring Mr. Boshea from calling movant and Daniel White as witnesses who could substantiate the legitimacy of the employment contract and the debt owed to Mr. Boshea. Despite these efforts, Movant is thankful Mr. Boshea ultimately prevailed over their scheme.

The Flywheel case and Maryland Case are inextricably linked with the Boshea case. John White and Mr. Stern used the Boshea litigation to formulate and pursue their "RICO" conspiracy theory in the Flywheel case—a narrative they maintained for seven years across federal trial, appellate proceedings, and in Maryland courts. In 2025, they inserted false allegations into the Maryland case, accusing Mr. Boshea and Movant of conspiring to steal trade secrets, and then forwarded the amended Maryland pleadings to the Illinois probate court. They also used the Maryland case to improperly obtain a continuance in this action. Given this pattern of coordinated litigation conduct, these matters are plainly intertwined and should be considered together for purposes of evaluating bad faith in the Boshea litigation.

In *Chambers*[3], the Court held that federal courts have inherent power to sanction parties for conduct that abuses the judicial process, and this authority extends to sanctionable acts that occur both prior to the commencement of litigation and during its course. The Court stated that its inherent power allows for sanctions "for a full range of

---

[3] Chambers v. Nasco, Inc., 501 U.S. 32 (1991)

litigation abuses," including conduct "extending beyond the courtroom," such as attempts to deprive the court of jurisdiction, fraudulent acts before suit is filed, and other bad faith actions.

The court in *Chambers* noted that the alleged sanctionable conduct was that Chambers had attempted to deprive the court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of the court. The court deemed Federal Rule of Civil Procedure 11 insufficient to support the sanction against Chambers and declined to impose sanctions under 28 U.S.C. § 1927 because the statute was not broad enough to reach "acts which degrade the judicial system." The court therefore relied on its inherent power in imposing sanctions. In affirming the District Court and the Court of Appeals, the Supreme Court held that "the court did not err in imposing sanctions for conduct before other tribunals, since, as long as Chambers received an appropriate hearing, he may be sanctioned for abuses of process beyond the courtroom."

## CONCLUSION

For the reasons set forth above, Movant respectfully asserts that John White and Mr. Stern have never legally or genuinely represented Compass Marketing, Inc., but have instead pursued their personal interests. See Exhibit 1. Their control of the litigation, in disregard of the true ownership structure and the interests of the company and its shareholders, has caused profound harm, subjecting Compass to enormous unnecessary liability and costs, while irreparably harming Mr. Boshea's family.

John White and Mr. Stern's pattern of conduct have included falsely asserting authority over Compass, obscuring ownership, and engaging in protracted litigation primarily to serve

their personal and unrelated business interests. Despite all parties consistently acknowledging Movant's status as a shareholder, and despite authoritative findings confirming joint ownership with Daniel White, John White and Mr. Stern continued their pretense of exclusive control. Their conduct not only resulted in financial injury to Compass but also in severe personal harm to Mr. Boshea and his family, culminating in his untimely death.

Had John White and Mr. Stern simply honored Compass's obligations or sought a reasonable resolution rather than pursuing this self-serving strategy, such extensive harm could have been avoided. Movant therefore respectfully requests that the Court reconsider its ruling, give due regard to the manifest injustice and factual clarifications presented in this motion, and grant the relief requested.

Respectfully submitted,

Michael White
39650 Hiawatha Circle
Mechanicsville, MD 20650
301-481-5986
michaelrwhite@comcast.net

9

Certificate of Service

I hereby certify that on this 17th day of November, a copy of this notice was sent via first class mail, postage paid to counsel of record.

Stephen B. Stern Esq
Kagan Stern Marinello & Beard LLC
238 West Street
Annapolis Maryland 21401

Heather K. Yeung Esq
Davis, Agnor, Rapaport & Skalny LLC
11000 Broken Land Parkway Suite 600
Columbia Md 21044

Gregory J. Jordan Esq
Jordan & Zito LLC
350 North LaSalle Street Suite 1100
Chicago IL 60654

Thomas J. Gagliardo Esq
Gilbert Employment Law PC
1100 Wayne Ave Suite 900
Silver Spring Maryland 20910

Jonathan P.Kagan
Managing Partner
Kagan Stern Marinello & Beard LLC
238 West Street
Annapolis Maryland 21401

Michael R. White
39650 Hiawatha Circle
Mechanicsville Md 20659
michaelrwhite@comcast.net

10

## IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

COMPASS MARKETING, INC.,                  :
                                          :
    Plaintiff,                           :
                                          :
v.                                        :        Case No. C-02-CV-23-000601
                                          :
DANIEL WHITE, et al.,                     :
                                          :
    Former Defendants.                   :

## DANIEL WHITE'S REPLY TO "MOTION TO STRIKE SANCTIONS"
### (Request for Hearing)

Daniel White ("Movant") respectfully submits this Reply to the Respondents'

"Motion to Strike Sanctions Against Non-Party".

> *"John White ... is a non-party to the above captioned matter."* [1]

Seven years later, the $24,000,000,000 BSRICO (Blackmail Scheme RICO) [2] is

where it was always destined to end. All despicable bogus claims against all former

defendants have been voluntarily dismissed with prejudice, with judgments entered for all

former defendants.

---

[1] *Compass Marketing, Inc. v. Daniel White, et al.*, John's Reply in Opp. to Motion for Sanctions, Case No. C-02-CV-230000601, first sentence (Anne Arundel Cir. Ct. October 24, 2025).

[2] At the core of the retaliation and extortion effort is the filing of five versions of the meritless "RICO" action—collectively referred to as BSRICO—that John and Mr. Stern conceived in 2018 and have maintained without interruption to this day. Morgan Lewis and Jeff Moorad filed the original bogus "RICO" complaint on February 14, 2022. Later attorneys Rod Rosenstein, Robert L. Ehrlich, Jr., King & Spaulding, KSMB, and SLG joined John's legal team. *Compass Marketing, Inc. v. Flywheel Digital, LLC, et al.*, GLR-22-379 (D. Md.) (Russell, C.J.).

Mr. Stern asserts he only followed instructions from John White, and his actions are *"a nullity"* [3] because Ms. Smithey filed three amendments. Ms. Smithey states she only relied on representations from "Morgan Lewis" and John White, and although she was a mediator in a directly related case, she had to withdraw for some different emergency. John now contends he *"is a non-party to the above captioned matter."* All "Compass" attorneys have abandoned this case - and Compass Marketing.

This spurious lawsuit, like the federal edition before it [4], was never about "RICO" or trade secrets or embezzlement. It was always a disgraceful joinder of retaliation against Movant for reporting securities fraud by John and Mr. Stern to federal authorities, and blackmail against Mr. DiPaula and Mr. Miller. This Court's judgment for Flywheel has ended the blackmail, but John and Mr. Stern continue their retaliation against Movant, both in the federal *Boshea* [5] case and the Arlington County dissolution [6]. Movant's request for sanctions, at its core, is a simple appeal for this Court to hold accountable those individuals who used this Court to file and maintain this fraudulent lawfare against the former defendants, and against the dignity of this Court.

---

[3] It is uncertain how Mr. Stern characterizes his efforts ostensibly on behalf of Compass and Tagnetics in federal bankruptcy, trial, and appellate courts in Ohio, where he shoveled Compass money through his law firm to disgruntled Tagnetics investors, and Mr. Fernandez, and invoiced Compass for his work. Perhaps that too is a nullity, and John a non-party.

[4] *Compass Mrktg, Inc. v. Flywheel Digital, LLC, et al.*, GLR-22-379 (D. Md.) (Russell, C. J.).

[5] *Ashley Boshea, as Administrator of the Estate of David John Boshea v. Compass Marketing, Inc.*, Civil No. ELH-21-309 (D. Md.) (Hollander, J.).

[6] *Michael White v. Compass Mrkt., Inc.*, Case No. 013CL21004012-00 (Cir. Ct. Va., Arlington).

John and Mr. Stern, specifically for this illegitimate lawsuit, maliciously fabricated the two critical pillars of the BSRICO conspiracy – Movant's "secret" investment in Flywheel with "embezzled" funds, and Mr. DiPaula's and Mr. Miller's theft of a fictitious Compass "trade secret". Exhibits within this Reply that prove the falsity of both the "secret investment" and "trade secret" theft have been publicly recorded and available in the *Boshea* case for years, as indicated by their docket stamps. Some attorneys who signed this spurious lawsuit and its federal precursor knew the claims were categorically false. Others obviously did not care whether they were or not.

Respondents' motion does not address the evidence of multiple frauds perpetrated by him or support his attorneys who signed his filings over six years. Respondent does not acknowledge the false stories he told, and paid others to repeat, to law enforcement agencies, regulatory bodies, newspapers, tabloids, employers, Ohio bankruptcy court, Illinois probate court, federal and state trial courts, Courts of Appeal for the Fourth and Sixth Circuits, Judicial Disabilities Commission, juries, prosecutors, lawyers, families, litigation investors, and innumerable third parties, nor falsehoods to this Court.

For the last seven years, John was the self-proclaimed alter-ego of Compass Marketing, Tagnetics and Smart Retail, and deceptively held himself out as Chairman, Chief Executive Officer, and majority shareholder of all three. Mr. Stern was the attorney for all three, and a Smart Retail owner. John wrote the first BSRICO draft and hired lawyers to sign their good names on blackmail ransom notes disguised as lawsuits. This Court should impose sanctions because counsel repeatedly advanced and expanded allegations they knew were false, and used this Court to perpetuate meritless, retaliatory

3

litigation built on knowingly fabricated "evidence," despite clear proof those assertions were untrue. This conduct is precisely the type of litigation abuse Md. Rule 1-341 was designed to deter and punish and should not be permitted to stand unaddressed.

**BS RICO Day One**

---

**Chip**

---

**John White** <jwhite@compassmarketinginc.com>                      Fri, Nov 2, 2018 at 11:15 AM
To: Daniel White <dwhite@compassmarketinginc.com>, Mike White <mwhite@compassmarketinginc.com>, Cell Eileen <eburgess@compassmarketinginc.com>, Kathy Barilone <kbarilone@compassmarketinginc.com>

He sold Flywheel for $200 million yesterday.


--
John White
Chairman/CEO
Compass Marketing Inc.
www.compassmarketinginc.com

Figure 1 - John's Discovery of Flywheel's "$200 million" Sale (November 2, 2018)

On November 2, 2018, John learned that *"Chip ... sold Flywheel for $200 million yesterday"* and sent the above email (*Figure 1*) to four of his brothers and sisters. Desperate to pay back investors in his Tagnetics/Smart Retail Ponzi scheme, John determined he was going to get what he thought was his share of that Flywheel money by any means necessary, no matter who he had to trample.

John quickly hired three long-time associates and Mr. Stern to concoct a "fraud investigation" and immediately announced they had "discovered a conspiracy" that included theft of his $24 billion trade secret, previously undetected for five years, and multiple embezzlement schemes unnoticed for twenty years. John's fake conspiracy grew

4

to include international public companies, respected financial institutions, family members, police departments, Annapolis City, David Boshea and his daughter, friends, employees, and made-up "hit men" kidnappers driving a McCormick Paint van.

Inventing "The RICO Conspiracy"

Knowing they would never go along with proclaiming Mr. DiPaula and Mr. Miller (Chip and Patrick) stole anything from Compass, John's first step was to include the other Compass owners, Movant and Michael White, as "conspirators" with Flywheel [7]. Within days of learning about Flywheel's sale, John sent incoherent "termination" emails to Movant and Michael, to which they immediately responded by email explaining to John that he had no such authority, and met in Annapolis to tell him in person. A few weeks later, John and Mr. Stern, his new Smart Retail [8] partner, then imagined a "board meeting" at Mr. Stern's law office attended only by those two, and fictitiously "removed" Movant and Michael from Compass' board.

---

[7] Daniel and Michael together own 50% of Compass Marketing and were two of three members of the board when the last legitimate shareholders meeting was held. The three owners' previous familial relationship is not legally relevant, but wherever attorneys have purported to be representatives of "Compass", they could only have meant John, now a non-party. No single owner or director ever had unilateral authority to cause Compass to file these bogus lawsuits.

[8] Smart Retail, Inc., Articles of Incorporation, Filing ID 2019-000868971, incorporated August 2, 2019, Wyo. Sec'y of State; registered agent C T Corporation System; principal and mailing address 222 Severn Avenue, Building 14, Suite 200, Annapolis, MD 21403. Incorporator: John White. Attorney and electronic filer: Ryan Beard, Kagan Stern, who submitted the filing electronically on August 2, 2019, and executed the registered agent consent and certified compliance under Wyoming law. The filing was made under penalty of perjury, with express affirmation of John White's consent as incorporator, and the acknowledgment of criminal penalties for false filings under W.S. 6-5-308. (Wyo. Sec'y of State Aug. 2, 2019).

5

On May 1, 2019, realizing Movant and Michael would not fall for "being terminated" by John or "removed" by a fake board meeting, John hired the "security team" of Ron Bateman and Chuck Rubac to lock Movant and Michael out of the Compass office. That same day, John hired Todd Mitchell as Compass' "president" [9] for $650,000 per year. John also hired his old Tagnetics bookkeeper Luis Fernadez [10], who, together with Mr. Bateman, Mr. Rubac, and Mr. Mitchell, were paid nearly five million dollars through Compass payroll and constituted the phony "investigations team".

John immediately instructed Mr. Mitchell, Mr. Fernadez, Mr. Bateman, and Mr. Rubac to work with Mr. Stern to produce an "investigation" that would corruptly "discover" Movant and Michael had embezzled from Compass as part of a conspiracy with Chip and Patrick. (*Figure 2*). Meanwhile, Mr. Stern created Smart Retail, Inc. in Wyoming, which he owned with John, and began transferring Compass assets there. Mr. Stern invoiced Compass in July 2019 for meeting with Mr. Rubac and Mr. Bateman, and research of Ascential and "RICO predicate offenses". (*Figure 2*).

At the core of this extortion scheme was the deliberate use of the judicial system as a weapon. John and Mr. Stern deliberately employed a strategy to coerce, intimidate, and financially exhaust Movant by asserting claims they knew were false. To pursue this baseless litigation, they willfully fabricated the two cornerstone allegations of the

---

[9] Mr. Mitchell would later quit during the U. S. Department of Labor investigation into diversion of employee 401(k) withholdings but "return" in October 2021 as Compass' sock puppet CEO.

[10] Mr. Fernandez contacted John as soon as he was subpoenaed by aggrieved investors in the Tagnetics' Ohio bankruptcy case. In response, John hired Mr. Fernandez as "CFO" for Compass, Tagnetics and Smart Retail and illicitly paid Tagnetics investors $486,706 with Compass funds.

supposed BSRICO conspiracy: the knowingly false claim that Movant secretly invested

in Flywheel with embezzled funds; and the cockamamie accusation that Mr. DiPaula and

Mr. Miller stole a non-existent Compass "trade secret."

Case 1:21-cv-00309-ELH   Document 269-6   Filed 05/21/24   Page 2 of 3

LAW OFFICES
## KAGAN STERN MARINELLO & BEARD, LLC
218 WEST STREET
ANNAPOLIS, MARYLAND 21401
Telephone 410-216-7900
Facsimile 410-705-0356

Compass Marketing, Inc.                                           August 5, 2019
c/o John White, CEO
222 Severn Avenue - Building 14 - Suite 200
Annapolis, Maryland 21403

|        |                                                                                                                  |       | Matter: | 191668 |
|--------|------------------------------------------------------------------------------------------------------------------|-------|---------|--------|

ATTN:                                                                               Matter:      191668
                                                                                    Invoice:     703
RE:     Shareholder Dispute

| Date | Description | Hours | Amount | Lawyer |
|------|-------------|-------|--------|--------|
| Jul-08-19 | Meet with J. White regarding status and strategy. | 0.60 | 225.00 | SBS |
| Jul-09-19 | Telephone call with C. Rubac regarding status and strategy. | 0.30 | 112.50 | SBS |
| Jul-15-19 | Meet with C. Rubac and R. Bateman (1.4); preliminary review and analysis of Ascential financial report (.5). | 1.90 | 712.50 | SBS |
| Jul-16-19 | Research civil RICO claim elements (3.0) [Half Charge = $225.00]; research civil RICO standing requirements (1.0); draft memo regarding same (.3). | 2.80 | 420.00 | EMM |
| Jul-17-19 | Research civil RICO predicate offenses (1.3); research and identify issues regarding civil RICO claim elements (2.0); draft memo regarding same (.3) [No Charge = $45.00]. | 3.30 | 495.00 | EMM |
| Jul-18-19 | Meet with J. White regarding strategy. | 0.20 | 75.00 | SBS |
|  | Research factually analogous civil RICO case law. | 2.30 | 345.00 | EMM |
| Jul-19-19 | Analyze RICO/fraud issues. | 0.20 | 75.00 | SBS |
| Jul-26-19 | Research ivil RICO predicate offense elements (1.0); identify possible legal issues regarding predicate offenses (.2); draft memo regarding same (.1) [No Charge = $15.00]. | 1.20 | 180.00 | EMM |

Figure 2 - COMPASS Billing Statement from KSMB (July 2019)

7

By July 16, 2019, just seven months after learning "Chip sold Flywheel for $200 million," John and Mr. Stern, joined by fellow Tagnetics and Smart Retail investor Mitch Goldsmith, had merged the retaliation against Movant and the extortion against Chip and Patrick into the BSRICO: **"RE: possible contingency case vs. Dan & Chip"** (*Figure 3*). One of the many problems with Mr. Goldsmith's early BSRICO plan was that John and Mr. Stern were running out of time. As shown below through <u>Compass</u> emails included in the *Boshea* case, John, Mr. Stern, and Mr. Goldsmith each acknowledged the October 2019 statute of limitations deadline, even for BSRICO (*Figure 4*).

> *"We [John and Mr. Stern] have a follow up meeting with the FBI Monday. After understanding how they intend to prosecute and/or if restitution can be included we will decide on engagement. <u>We do understand the concern around potential statute of limitations for some of the civil claims</u>. We will make an informed business decision next week. Appreciate your patience while we consider our best options. John"*. [September 20, 2019]. (*Figure 4*).

John and Mr. Stern were still hoping their dishonest reports to law enforcement, employers and the press would prompt false criminal charges or other punitive actions against Movant and Michael (*Figure 4*). Those efforts failed – the allegations were so absurd. Unlike John's lawyers, law enforcement investigators did not just accept the moronic "private investigation" supplied by John, Mr. Stern, Mr. Bateman and Mr. Fernandez without independently verifying the reports, and their thorough review exposed the scheme as unfounded.

8

Case 1:21-cv-00309-ELH    Document 269-7    Filed 05/21/24    Page 3 of 9

⟨ *ompass* MARKETING                                        John White <jwhite@compassmarketinginc.com>

**RE: possible contingency case vs. Dan & Chip**
1 message

Goldsmith, Mitchell D. <mgoldsmith@taftlaw.com>                        Tue, Jul 16, 2019 at 6:00 PM
To: John White <jwhite@compassmarketinginc.com>

John has won some big lawsuits for Peoples Gas in Illinois (they have booted out other counsel recently to take over more of their matters...not sure if I have any clippings on it)...

From: John White <jwhite@compassmarketinginc.com>
Sent: Tuesday, July 16, 2019 9:07 AM
To: Goldsmith, Mitchell D. <mgoldsmith@taftlaw.com>
Subject: Re: possible contingency case vs. Dan & Chip

Didn't he case Kennedy had get any press? Anything I can read about ?

John White
Chairman/CEO
Compass Marketing Inc
www.compassmarketinginc.com

On Tue, Jul 16, 2019, 5:30 AM Goldsmith, Mitchell D. <mgoldsmith@taftlaw.com> wrote:

I spoke to one of our top litigators, John Kennedy who was intrigued by the concept and would be willing to discuss it further. Let me know some available times and I can try to set up a call (also let me know if you want to include Steven or anyone else on that call)...

Figure 3 – Goldsmith's Email "RE: contingency case vs. Dan & Chip" (July 16, 2019)

                                        John White <jwhite@compassmarketinginc.com>
        Case 1:21-cv-00309-ELH    Document 269-7    Filed 05/21/24    Page 4 of 9

**Re: Proposal for litigation assessment/engagement - subject to attorney client privilege**
1 message

John White <jwhite@compassmarketinginc.net>                        Fri, Sep 20, 2019 at 12:12 PM
To: "Kennedy, John" <jkennedy@taftlaw.com>, "Goldsmith, Mitchell D." <mgoldsmith@taftlaw.com>, John White <jwhite@compassmarketinginc.com>
Cc: "stern@kaganstern.com" <stern@kaganstern.com>, "Babbitt, Elizabeth E." <ebabbitt@taftlaw.com>

Thanks John

We have a follow up meeting with the FBI on Monday.
After understanding how they intend to prosecute and / or if restitution can be included we will decide on engagement.

We do understand the concern around potential statute of limitations for some of the civil claims.

We will make an informed business decision next week. Appreciate your patience while we consider our best options.

Thanks John
John

Figure 4 – John and Mr. Stern's Reply to Mr. Goldsmith (September 20, 2019)

9

### BSRICO PILLAR ONE – Falsify Daniel's "Secret Investment" in Flywheel
(Moving the Statute of Limitations Goal Post)

John and Mr. Stern knowingly misrepresented a legitimate cashier's check that Movant issued to Chip DiPaula on October 14, 2015, recasting it as a "secret" Flywheel investment. Movant emailed the check to John on October 15, 2015, expressly identifying it as a lawful (and agreed) business payment. Mr. Stern used this same check and email during Movant's deposition in the *Boshea* case on November 29, 2021. Yet, when John and Mr. Stern filed the initial BSRICO complaint ten weeks later on February 14, 2022, they deliberately detached the check from the explanatory email and alleged—falsely—that it was first "discovered" by Mr. Fernandez during a 2020 "audit".

On August 25, 2015, Chip sent an email to John and Michael: *"Unpaid wages"*, *"seeking your attention and action to pay outstanding wages owed to me. We have had numerous rounds of conversation during which you confirmed to me that Compass owes me a significant amount in outstanding wages ..."* (*Figure 5*).

Michael forwarded Chip's email to Movant on that same day, August 25, 2015. (*Figure 5*). At John's request, Movant emailed Chip the next evening, August 26, 2015, and offered to meet with him to resolve the matter. (*Figure 6*). Chip emailed Movant the next morning, August 27, 2015, and agreed to meet. (*Figure 6*). Movant forwarded Chip's August 27, 2015, email to John and Michael. (*Figure 6*). John responded to Movant: *"Looks promising. Can you flip me the note you sent him?"* (*Figure 6*).

Movant, John and Michael agreed to pay Chip and Patrick $50,000 to resolve all outstanding pay and other liabilities. On October 15, 2015, Movant sent John and Michael an email with a copy of his cashier's check #300696818-4 embedded in the email. (*Figure 7*). *"Copy of first payment on the DiPaula/Miller severance attached. As a reminder, I/we agreed to $15k each for any/all pay and liability plus 20k for CD for his expenses … 60k less than they asked for and probably 75k less than the triple damages the AG would have made us pay."* (*Figure 7*). John responded to Movant three minutes later: *"Great work! … I for one will be sleeping better tonight."* (*Figure 8*).

At Movant's November 29, 2021, deposition, Mr. Stern expressly confirmed that the $10,000 cashier's check to Mr. DiPaula was part of a single, uninterrupted email chain between Movant and John, in which John authorized and approved the severance payment. In Movant's *Boshea* deposition, **Mr. Stern introduced the email and check as one document—KSMB Exhibit 19—**exactly as Movant sent it to John and Michael White on October 15, 2015, and exactly as it existed in Compass's files. Yet when Morgan Lewis filed the first BSRICO complaint on February 14, 2022, [11] —and again in Mr. Stern's state complaint on March 27, 2023—they deliberately detached the check from its explanatory email and falsely alleged it was first "discovered" by Mr. Fernandez in 2020. John and Mr. Stern then knowingly misrepresented this severance as a "secret" Flywheel investment and illegitimate payment to Mr. DiPaula and Mr. Miller. [12]

---

[11] *Compass Mrktg, Inc. v. Flywheel Digital, LLC, et al.*, GLR-22-379 (D. Md.) (Russell, C.J.).

[12] Mr. Stern: *"the previous exhibit before that should have been just a two page document. One is an email dated October 15, 2015 at 10:51 a.m. is the most recent in the string. There was*

## M Gmail

### Fwd: Unpaid wages
1 message

**Mike White** <mwhite@compassmarketinginc.com>                               Tue, Aug 25, 2015 at 11:14 AM
To: Daniel J White <dwhite@compassmarketinginc.com>

--------- Forwarded message ---------
From: **Chip DiPaula** <cdipaula@gmail.com>
Date: Tuesday, August 25, 2015
Subject: Unpaid wages
To: John White <jwhite@compassmarketinginc.com>, Michael White <mwhite@compassmarketinginc.com>


Gentlemen,


I am seeking your attention and action to pay outstanding wages owed to me. We have had numerous rounds of conversation during which you confirmed that Compass owes me a significant amount in outstanding wages for accrued, unused paid leave. However, subsequent correspondence and your lack of follow through is worrisome and disappointing. These wages are owed and were due to be paid in October 2014. These outstanding wages should be paid immediately, or at the latest, by Compass' next payroll date of September 1, 2015.


In addition, I did fulfill your request to complete expense account reconciliation three months ago, and look forward to Compass' prompt payment of the reimbursements to which I am also entitled.


Please respond promptly with your plans for payment.


Thank you,

Chip


Figure 5 - Chip's Email to John and Michael (August 25, 2015)

---

*another one beneath that and attached to it was a copy of an Official Check from M & T Bank.
Remitter Daniel J. White dated October 14, 2015 for $10,000 paid to the order of James C.
DiPaula. Those two pages is one document and that's one exhibit. I guess that's 19 ... '*Daniel
White Dep. P. 167:1, Nov. 29, 2021, *Boshea*, No. 1:21-cv-00309 (D. Md.). (*Figure 9*).

12

**M** Gmail

**(no subject)**
4 messages

---

Daniel White <dwhite@compassmarketinginc.com>                    Wed, Aug 26, 2015 at 7:34 PM
To: cdipaula@gmail.com

Chip,

Good evening.

I am hesitant to wade in at this late stage but Mike forwarded me an email that you sent a couple of days ago. I am sorry this situation has gotten where it has and sorry that I did not know about it sooner.

If you would like me to try and help resolve it I am glad to meet you for breakfast or dinner next week. If you feel like you have talked it out enough already I completely understand.

Best Regards,

Daniel White

---

Chip DiPaula <cdipaula@gmail.com>                    Thu, Aug 27, 2015 at 9:44 AM
To: Daniel White <dwhite@compassmarketinginc.com>

Dan,
Always great hearing from you, and I would certainly enjoy meeting next week.
Please let me know what's best for your schedule, and I'll do my best to make it work.

Thanks,
Chip

---

Daniel White <dwhite@compassmarketinginc.com>                    Thu, Aug 27, 2015 at 10:10 AM
To: John White <jwhite@compassmarketinginc.com>
Bcc: Michael Robert White <mwhite@compassmarketinginc.com>

Daniel White
---------- Forwarded message ----------
From: "Chip DiPaula" <cdipaula@gmail.com>
Date: Aug 27, 2015 9:44 AM
Subject: Re:
To: "Daniel White" <dwhite@compassmarketinginc.com>
Cc:

---

John White <jwhite@compassmarketinginc.com>                    Thu, Aug 27, 2015 at 10:17 AM
To: Daniel White <dwhite@compassmarketinginc.com>

Looks promising.
Can you flip me the note you sent him?

John White
Chairman/CEO

---

Figure 6 – John and Movant's Email Chain RE: Movant Meeting with Chip

13



**M Gmail**

## CCD SEVERANCE PMT 1 DW 2015OCT15 10/15/2015 10:34
2 messages

Compass Marketing #18400 <printer@compassmarketinginc.com>    Thu, Oct 15, 2015 at 10:34 AM
To: Daniel White <dwhite@compassmarketinginc.com>

Scanned from MFP07757190
Date:10/15/2015 10:34
Pages:2
Resolution:300x300 DPI

📄 CCD SEVERANCE PAYMENT 1 DW 2015OCT15-10152015103438.pdf
1195K

Daniel White <dwhite@compassmarketinginc.com>    Thu, Oct 15, 2015 at 10:51 AM
To: John White <jwhite@compassmarketinginc.com>, "White, Michael Robert" <mwhite@compassmarketinginc.com>
Bcc: Daniel White <dwhite@compassmarketinginc.com>

Copy of first payment on the DiPaula/Miller severance attached.

As a reminder, I/we agreed to 15k each for any/all pay and liability plus 20k to CD for his expenses (10 of which was his AYC initiation fee we agreed to pay a few years ago). 60k less than they asked for, and probably 75k less than the triple damages the AG would have made us pay.

Will need 1099s for them at the end of the year.

Daniel White
Compass Marketing, Inc.

mobile: 240-298-8156
facsimile: 240-214-0414
text: 2402988156@vtext.com
[Quoted text hidden]

📄 CCD SEVERANCE PAYMENT 1 DW 2015OCT15-10152015103438.pdf
1195K



Figure 7 – Daniel's Email and Cashier's Check for First Payment (October 15, 2015)

14

 Gmail

## Re: CCD SEVERANCE PMT 1 DW 2015OCT15 10/15/2015 10:34
1 message

John White <jwhite@compassmarketinginc.com>                        Thu, Oct 15, 2015 at 10:54 AM
To: Daniel White <dwhite@compassmarketinginc.com>
Cc: "White, Michael Robert" <mwhite@compassmarketinginc.com>

Great work!

I also saw you got Janie and Mike O locked into the non compete!
Ecommerce is our rock now! Who would have ever thought....

I for one will be sleeping better this evening.

Thx Bro!
John

John White
Chairman/CEO
Compass Marketing Inc
www.compassmarketinginc.com

> On Oct 15, 2015, at 10:51 AM, Daniel White <dwhite@compassmarketinginc.com> wrote:
>
> Copy of first payment on the DiPaula/Miller severance attached.
>
> As a reminder, I/we agreed to 15k each for any/all pay and liability plus
> 20k to CD for his expenses (10 of which was his AYC initiation fee we
> agreed to pay a few years ago). 60k less than they asked for, and probably
> 75k less than the triple damages the AG would have made us pay.
>
> Will need 1099s for them at the end of the year.
>
>
> Daniel White
> Compass Marketing, Inc.
>
> mobile: 240-298-8156
> facsimile: 240-214-0414
> text: 2402988156@vtext.com
>
> ———— Forwarded message ————
> From: Compass Marketing #18400 <printer@compassmarketinginc.com>
> Date: Thu, Oct 15, 2015 at 10:34 AM
> Subject: CCD SEVERANCE PMT 1 DW 2015OCT15 10/15/2015 10:34
> To: Daniel White <dwhite@compassmarketinginc.com>
>
>
> Scanned from MFP07757190
> Date:10/15/2015 10:34
> Pages:2
> Resolution:300x300 DPI
> ————————————
> <CCD SEVERANCE PAYMENT 1 DW 2015OCT15-10152015103438.pdf>

Figure 8 - John "Great Work!" Email to Daniel (October 15, 2015)

15

Transcript of Daniel J. White
Conducted on November 29, 2021                    167

| | | |
|---|---|---|
| 1 | MR. STERN:  Okay, and we were -- there was | 11:36:46 |
| 2 | apparently some misunderstanding or | 11:36:49 |
| 3 | miscommunication about the last exhibit.  The last | 11:36:50 |
| 4 | exhibit -- or I guess there was an introduction of | 11:36:52 |
| 5 | an exhibit for a check dated December 9, 2015 but | 11:36:56 |
| 6 | the previous exhibit before that should have been | 11:37:00 |
| 7 | just a two page document.  One is an e-mail dated | 11:37:02 |
| 8 | October 15, 2015 at 10:51 a.m. is the most recent | 11:37:07 |
| 9 | in the string.  There was another one beneath that | 11:37:11 |
| 10 | and attached to it was a copy of an Official Check | 11:37:14 |
| 11 | from M & T Bank.  Remitter Dan White -- Daniel J. | 11:37:17 |
| 12 | White dated October 14, 2015 for $10,000 paid to | 11:37:21 |
| 13 | the order of James C. DiPaula.  Those two pages is | 11:37:24 |
| 14 | one document and that's one exhibit.  I guess | 11:37:27 |
| 15 | that's 19 and then we're on to 20 if I'm doing the | 11:37:31 |
| 16 | numbering correctly.  20 being an Official Check, | 11:37:33 |
| 17 | M & T Bank.  Remitter Daniel White dated | 11:37:37 |
| 18 | December 9, 2015 paid to the order of James Chip | 11:37:42 |
| 19 | DiPaula for $25,000. | 11:37:45 |
| 20 | MR. JORDAN:  Hold on.  What is that?  I | 11:37:48 |
| 21 | have a corrected Exhibit 19 is the e-mail and the | 11:37:51 |
| 22 | $10,000 check.  That's what Heather just sent to | 11:37:55 |

Figure 9 - Mr. Stern's Deposition of Movant (November 29, 2021)

To dodge the October 2019 statute of limitations, John and Mr. Stern deliberately separated Movant's October 15, 2015, email from its attached cashier's check and intentionally falsified the record to depict a lawful severance payment as a covert Flywheel investment funded by embezzled money. They later repeated this knowingly false narrative in multiple pleadings and appeals, claiming that Mr. Fernandez had "discovered" the check during a 2020 audit—a contention wholly fabricated to conceal their manipulation of evidence and extend their fraudulent claims. (*Figure 6*).

> *"A Compass auditor on the internal investigation team discovered multiple checks issued from Daniel White's personal account to Defendant Chip DiPaula. These checks were part of a severance scheme designed to deprive Compass of funds (and harm Compass in other respects, such as use Compass' funds to covertly invest in and build a competitor that became Flywheel) ... On October 14, 2015, more than 13 months after Defendant DiPaula resigned from Compass, Daniel had M&T Bank issue a cashier's check for $10,000 to DiPaula, using Daniel's personal funds."* Compass Marketing Complaint ¶ 202. (*Figure 10*).

The allegation that Movant stole Compass funds in 2015 to secretly invest in Flywheel—and that Mr. Fernandez later "discovered" the cashier's check during an audit—is a deliberate lie. This fabricated assertion was the first essential pillar of the BSRICO narrative devised by John and Mr. Stern. This Court should not permit such abuse of process to stand. Knowingly advancing malicious false claims in bad faith constitutes the core of sanctionable conduct under Md. Rule 1-341. See *Christian v. Maternal–Fetal Medicine Assocs.*, 459 Md. 1, 19–21 (2018) (Rule 1-341 sanctions appropriate where claims are knowingly false or asserted with reckless disregard for truth); *Inlet Associates v. Harrison Inn Inlet, Inc.*, 324 Md. 254 (1991) ("In bad faith,"

17

within meaning of statute providing for award of costs and/or attorney fees in proceeding maintained or defended in bad faith, means vexatiously, for purpose of harassment or unreasonable delay, or for other improper reasons); *In re Chaires*, 249 B.R. 101 (2000) (bad faith component of Maryland procedural rule providing for award of counsel fees against party or party's attorney, for pursuing litigation in bad faith or without substantial justification, requires inquiry into subjective state of mind of the actor, and inherently speaks to intent to inflict harm); *Seney v. Seney*, 97 Md.App. 544 (1993) ("Bad faith" in context of rule permitting court to require party who maintains or defends action in bad faith to pay opponent's attorney's fees means vexatiously, for purpose of harassment or unreasonable delay, or for other improper reasons); *Watson v. Watson*, 73 Md.App. 483 (1988) (sanctions were upheld where fraud was clearly established).

As observed by the Supreme Court in *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-67 (1980): The bad-faith exception for the award of attorney's fees is not restricted to cases where the action is filed in bad faith. "'[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 15 (1973). The power of a court over members of its bar is at least as great as its authority over litigants. If a court may levy counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes. Attorneys' fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record. But in a proper case, such as here, sanctions are within a court's powers.

**E. Compass Discovers Michael and Daniel White are Connected to Miller, DiPaula, and Flywheel's Trade Secret Theft**

202. A Compass auditor on the internal investigation team discovered multiple checks issued from Daniel White's personal account to Chip DiPaula. These checks were the start of a trail that led Compass to recently discovery that Michael and Daniel White are part of the conspiracy by DiPaula and Miller to found and operate Flywheel as a competitor of Compass's using Compass's stolen trade secrets and proprietary information and know how.

203. On October 14, 2015, more than 13 months after DiPaula resigned from Compass, Daniel had M&T Bank issue a cashier's check for $10,000 to DiPaula, using Daniel's personal funds.



Figure 10 – Daniel's Cashier's Check Separated from His 10/15/2015 Email; Described As "Discovered" By "Compass Auditor" Fernandez in BSRICO (February 14, 2022).

19

## BSRICO PILLAR TWO - Patrick Miller's "Secret" 2015 Digital Grocery Presentation
("Discovering" the Fake Trade Secret)

To complete the BSRICO narrative, John and Mr. Stern also had to devise something they could describe as a "stolen trade secret" **and** a reason they had not "discovered" Flywheel using it for five years. So, John, Mr. Stern and Mr. Fernandez pretended to find Patrick Miller's November 5, 2015, "Online & Digital Grocery Summit USA 2015" presentation on January 20, 2020 – even though John sent the same announcement to Movant and Chris Feiss [13] on September 1, 2015. (*Figures 11 and 12*).

John forwarded [14] the Online & Digital Grocery Summit USA 2015 email invitation to Movant and Mr. Feiss on September 1, 2015, at 2:55 AM, included a link to the agenda, and wrote: *"note that Patrick Miller is a speaker."* (*Figure 11*). Later that morning, Mr. Feiss wrote back to John and Movant, offering to find a client to pay for attending the summit, and suggesting Compass only attend if a Compass employee could also give a presentation at the conference, like Patrick Miller. *"Would only do if we can split w a client [and] Alex can get a similar speaking role to PM."* (*Figure 12*). In both federal trial and appellate courts, and in this Court, John and Mr. Stern repeatedly and falsely insisted they had never seen Patrick Miller's 2015 Digital Grocery Summit USA presentation until Mr. Fernandez "discovered" on January 20, 2020. (*Figures 13- 21*).

---

[13] John employed Mr. Feiss as "Chief Strategy Officer" for Compass, Tagnetics, and Smart Retail. Mr. Feiss worked for Compass throughout this BSRICO, and knew this was false.

[14] John received the Online & Digital Grocery Summit 2015 email invitation on August 21, 2015, and asked for pricing information on August 28, 2015. (*Figure 11*).

20

## M Gmail

**Fwd: Online & Digital Grocery Summit USA 2015**

John White <jwhite@compassmarketinginc.com>                                    Tue, Sep 1, 2015 at 2:55 AM
To: Daniel White <dwhite@compassmarketinginc.com>, Chris Feiss <cfeiss@compassmarketinginc.com>, Dayna Bernard
<dbernard@compassmarketinginc.com>

Note that Patrick Miller is a speaker...

http://www.digitalgrocerysummit.com/#!agenda/cjg9

--------- Forwarded message ---------
From: Alex McCord <amccord@compassmarketinginc.com>
Date: Fri, Aug 28, 2015 at 9:29 AM
Subject: Re: Online & Digital Grocery Summit USA 2015
To: John White <jwhite@compassmarketinginc.com>
Cc: Dayna Bernard <dbernard@compassmarketinginc.com>


Gold: $9,050
Silver: $7,550
Bronze: $6,050

Details for each outlined in the attached. We may be able to link with a partner to share costs, but with current
environment may make sense to pass for now.


On Fri, Aug 28, 2015 at 7:15 AM, John White <jwhite@compassmarketinginc.com> wrote:
> Alex,
> Did they give booth costs associated with it?
> John
>
>
> John White
> Chairman/CEO
> Compass Marketing Inc
> www.compassmarketinginc.com
>
> On Aug 21, 2015, at 12:55 PM, Alex McCord <amccord@compassmarketinginc.com> wrote:
>
>> John and Shawn,
>>
>> Wanted to put the following on your radar in case we have any interest.
>>
>> Online & Digital Grocery Summit USA 2015
>>
>> Compass has been invited to sponsor this event, which would include a booth and speaking
>> engagement. There are a lot of the relevant players attending, and wanted to see if you guys think this
>> would be a good use of our time.
>>
>> Digest and let me know any questions you might have. I know its not opportune timing, but wanted to
>> surface none the less.
>>
>> Thanks
>> Alex

Figure 11 – John's Email – "Patrick is a speaker" Digital Grocery Summit USA 2015
(September 1, 2015)

21

 Gmail

---

## Fwd: Online & Digital Grocery Summit USA 2015

**Chris Feiss** <cfeiss@compassmarketinginc.com>                    ` Tue, Sep 1, 2015 at 7:50 AM
To: John White <jwhite@compassmarketinginc.com>
Cc: Daniel White <dwhite@compassmarketinginc.com>, Dayna Bernard <dbernard@compassmarketinginc.com>

Would only do if
We can split w a client
Alex can get similar speaking role to PM

Sent from my iPhone

On Sep 1, 2015, at 2:55 AM, John White <jwhite@compassmarketinginc.com> wrote:

> Note that Patrick Miller is a speaker...
>
> http://www.digitalgrocerysummit.com/#!agenda/cjg9
>
> ———— Forwarded message ————
> From: **Alex McCord** <amccord@compassmarketinginc.com>
> Date: Fri, Aug 28, 2015 at 9:29 AM
> Subject: Re: Online & Digital Grocery Summit USA 2015
> To: John White <jwhite@compassmarketinginc.com>
> Cc: Dayna Bernard <dbernard@compassmarketinginc.com>
>
> Gold: $9,050
> Silver: $7,550
> Bronze: $8,050
>
> Details for each outlined in the attached. We may be able to link with a partner to share costs, but with
> current environment may make sense to pass for now.
>
> On Fri, Aug 28, 2015 at 7:15 AM, John White <jwhite@compassmarketinginc.com> wrote:
>> Alex,
>> Did they give booth costs associated with it?
>> John
>>
>> John White
>> Chairman/CEO
>> Compass Marketing Inc
>> www.compassmarketinginc.com
>>
>> On Aug 21, 2015, at 12:55 PM, Alex McCord <amccord@compassmarketinginc.com> wrote:
>>
>>> John and Shawn,
>>>
>>> Wanted to put the following on your radar in case we have any interest.
>>>
>>> Online & Digital Grocery Summit USA 2015
>>>
>>> Compass has been invited to sponsor this event, which would include a booth and speaking
>>> engagement. There are a lot of the relevant players attending, and wanted to see if you

Figure 12 – Mr. Feiss' Response to John and Movant – *"only if we ... can get a speaking role similar to PM [Patrick Miller]"* (September 1, 2015)

186.    Fernandez engaged in further research and located a Flywheel-branded Power Point presentation and voiceover that Miller gave at the Online & Digital Grocery Summit USA on November 5, 2015 ("the Digital Grocery Presentation"). Miller's introduction included a review of his clients: P&G, J&J, Mars, McCormick, Ferrero, 5 Hour Energy, and Colgate. All of of these companies were Compass clients or former Compass clients.

Discovering how Amazon is a Brand, Social and Search Platform
Patrick Miller, Co-Founder, Flywheel Digital

3. FlyWheel Digital.pptx 

Screenshot from Digital Grocers Summit USA Website. Available at:
https://www.digitalgrocerysummit.com/presentations.

187.    Fernandez gave the article and the Digital Grocery Presentation to John White, who (i) immediately recognized the clients Miller claimed were Flywheel clients as Compass's clients, and (ii) further recognized the contents of the Digital Grocery Presentation as content that could only have been generated with knowledge of Compass's trade secret information and proprietary business know how. The Digital Grocery Presentation revealed that Flywheel, DiPaula, and Miller were in possession of the more comprehensive repository of Compass trade secrets, the eCommerce Guide. The Digital Grocery Presentation included key pieces of information that could only be known from the original Compass eCommerce Guide.

Figure 13 – Patrick Miller's 2015 Digital Grocery Summit Presentation
Now "Discovered" by Mr. Fernandez and Given to John on January 20, 2020
*Compass v. White*, No. C-02-CV-23-000601 (Md. Cir. Ct. Mar. 27, 2023).

23

217.    For example, the Digital Grocery Presentation provided information concerning Compass' general strategy to prioritize customer search results on Amazon. Even more significantly, the Digital Grocery Presentation represented an approach to selling clients' products through Amazon that precisely mirrors the Compass approach and could only be accomplished with possession of the eCommerce Guide.

218.    As previously outlined, Compass maintained only a single printed version of the eCommerce Guide as part of the protocol to maintain its confidentiality. However, while at Compass, Miller had access to the electronic version. Upon information and belief, Miller misappropriated the electronic version of the Compass eCommerce Guide, then he and DiPaula used it to develop the Flywheel business model. Based on Flywheel's own description of its

business on the Flywheel website, that use of the misappropriated Compass information continues today:

Figure 14 –2015 Digital Grocery Presentation "Discovered" by Mr. Fernandez on January 20, 2020, "Proving" Chip and Patrick Stole the Ecommerce Guide *Compass v. White*, No. C-02-CV-23-000601 (Md. Cir. Ct. Mar. 27, 2023).

24

The contention that on January 20, 2020, Mr. Fernandez "discovered" Patrick Miller's previously concealed November 2015 Digital Grocery Summit USA presentation "establishing" theft of Compass "trade secrets" is knowingly false. This fabricated narrative was engineered by John and Mr. Stern as the second essential pillar of the BSRICO scheme. Engineering and then advancing false claims falls squarely within the scope of sanctionable litigation abuse under Md. Rule 1-341. The Court should not countenance this calculated misuse of judicial process.

<u>John and Mr. Stern Make False Statements to the USCA Fourth Circuit</u>

The Honorable George L. Russell, III, Chief Judge, United States District Court for Maryland, dismissed the BSRICO federal version on February 24, 2023,[15] denying plaintiffs both their requested hearing and an opportunity to rewrite their complaint [16]. John and Mr. Stern appealed Chief Judge Russell's decision to the United States Court of Appeals for the Fourth Circuit. [Exhibits 1 and 2]. It is remarkable how many times in their Fourth Circuit Opening and Reply Briefs that John and Mr. Stern repeatedly insist "Compass" had *never* seen Patrick Miller's Digital Grocery Summit USA 2015

---

[15] *Compass Marketing, Inc. v. Flywheel Digital, LLC, et al.*, Civil No. GLR-22-379, 2023 WL __ (D. Md. Feb. 24, 2023) (Russell, C.J.).

[16] On February 24, 2023, Mr. Stern was Mr. Bateman's attorney (AACO Cir. Ct.) while Ms. Smithey was the court-appointed mediator. Mr. Stern was at the same time "Compass" attorney (i.e. John's attorney) in: the *Boshea* case (USDC MD), the *Tagnetics* case (Ohio bankruptcy), and the *Compass* dissolution case (Arlington, VA).

presentation until Mr. Fernandez "discovered" it on January 20, 2020, even though they knew these statements were false because they had plotted the lie. (*Figures 15 - 20*).

> "*On January 20, 2020* ... Compass's Controller located on the internet a Flywheel-branded Power Point presentation created by Patrick Miller that revealed, *for the first time*, that Flywheel had stolen and was continuing to misuse for unauthorized purposes Compass's trade secrets and proprietary business know how. JA19-20, ¶ 11." Compass' Opening Brief at 16, *Compass Marketing, Inc. v. Flywheel Digital, LLC*, No. 23-1324 (4th Cir. June 23, 2023). (*Figure 15*).

> "Compass alleged it discovered the Digital Grocery Presentation after January 20, 2020, which revealed the misappropriation of the trade secrets in 2015. JA19-20. Compass' Reply Brief at 11, *Compass Marketing, Inc. v. Flywheel Digital, LLC*, No. 23-1324 (4th Cir. September 11, 2023). (*Figure 16*).

John and Mr. Stern repeat *ad nauseum* the falsehood they had no knowledge of the 2015 Digital Grocery Summit USA presentation until January 20, 2020, and no inkling there was any potential "RICO" claim until January 20, 2020, despite clear evidence that was false, including: 1) KSMB invoicing Compass in July 2019 for "RICO" and "Ascential" research; 2) John, Mr. Stern and Mr. Goldsmith July 2019 "RE: possible contingency case vs. Dan & Chip" emails discussing a "RICO" case and acknowledging the October 2019 statute of limitations deadline; and 3) John's September 1, 2015, "2015 Digital Grocery Summit *Patrick Miller is a speaker*" email to Movant and Mr. Feiss, and Mr. Feiss' September 1, 2015, reply to John and Movant, which all disprove that claim [17].

---

[17] Mr. Stern filed the "Original Complaint" in Anne Arundel County Circuit Court on March 27, 2023 – before he knowingly made the false statements in the Opening and Reply briefs in the United States Court of Appeals for the Fourth Circuit. Still, KSMB contends that this Court "does not have jurisdiction" to weigh that conduct with their concurrent false statements in the Anne Arundel Circuit Court.

Amazingly, in their Fourth Circuit Opening and Reply briefs, John and Mr. Stern repeatedly and harshly criticized what they characterize as Chief Judge Russell's "improper credibility determination" that it was implausible "Compass" had no idea about Patrick's Digital Grocery presentation until Mr. Fernandez "discovered" it during his "investigation" on January 20, 2020 - even though John and Mr. Stern absolutely knew that claim was not true - they had manufactured the falsehood! (*Figures 15 - 20*).

> "One of the most obvious examples is where the district court expressly determined Compass' allegation of discovering the trade secret claims in January 2020 was not credible. The district court was required to accept Compass's allegations as true and draw all inferences in its favor. [] Beyond this improper credibility determination ..." Compass' Opening Brief at 40, *Compass Marketing, Inc. v. Flywheel Digital, LLC*, No. 23-1324 (4th Cir. June 23, 2023). (*Figure 18*).

> "Pointing to Miller's article and presentation ... From the Complaint, one only knows they were not discovered by Compass until January 2020. To infer they were available earlier is to draw an improper inference against Compass." Compass' Reply Brief at 46, *Compass Marketing, Inc. v. Flywheel Digital, LLC*, No. 23-1324 (4th Cir. Sept. 11, 2023). (*Figure 19*).

> "Finding that Compass's allegation o discovering the misappropriation in January 2020 '*strains credulity*,' the district court made credibility determinations against Compass. JA288. The court further disbelieved and drew inferences against Compass by finding it was implausible ..." Compass' Opening Brief at 18, *Compass Marketing, Inc. v. Flywheel Digital, LLC*, No. 23-1324 (4th Cir. June 23, 2023). (*Figure 20*).

By no later than July 2019, John and Mr. Stern were already planning litigation against Movant and Mr. DiPaula. Their emails openly discussed a "contingency case vs. Dan & Chip," acknowledged the looming October 2019 statute of limitations, and Mr. Stern began billing Compass for "RICO" and "Ascential" research. These communications contradict their sworn narrative that Mr. Fernandez "discovered" the supposed wrongdoing on January 20, 2020. Even earlier, on September 1, 2015, John

27

himself circulated an email identifying Patrick Miller as a speaker at the Digital Grocery Summit. That single email destroys their timeline and confirms that the existence of the presentation was known to John and Mr. Stern years before their alleged "discovery."

Despite this incontrovertible evidence, John and Mr. Stern accused Chief Judge Russell of committing an "improper credibility determination" when he dismissed their claims as implausible and found their narrative "strained credulity." Undeterred even when a unanimous Fourth Circuit panel reached the same conclusion, John and Mr. Stern petitioned for en banc review by the full Fourth Circuit while knowing that their discovery timeline was false. Worse, they devised the falsehood, thereby asking an entire federal appellate court to devote scarce judicial resources to a claim *that they fabricated*. En banc review is reserved for issues of exceptional legal or constitutional significance - not to resurrect a manufactured conspiracy theory for strategic or financial gain.

For more than seven years, John and Mr. Stern advanced a narrative they knew to be false—first to law enforcement, then to federal courts, and now to this Court. They manipulated documents, withheld exculpatory context, and refiled rejected claims in new forums. Their conduct has wasted judicial time, imposed unnecessary litigation costs, and inflicted personal and financial harm on Movant and others. The expenditure of the Fourth Circuit's limited judicial resources, like this Court's, was of no concern to John and Mr. Stern in their pursuit of leverage and financial gain. Their disregard for the truth and for the finite resources of both courts demonstrate that without meaningful sanctions, their misconduct will continue.

- "*It was not until January 20, 2020 that Compass discovered this prima facie evidence of Flywheel's misappropriation activities*. Given the contents of the Digital Grocery Presentation, which was copied from Compass's files, there is every reason to believe that the eCommerce Guide was also copied or otherwise exported to Flywheel by DiPaula and/or Miller. *This information was not known to Compass and could not reasonably have been known because DiPaula and Miller had acted in secret and concealed the existence of the misappropriation*." JA60, ¶ 191.

JA18, ¶ 6 (emphasis added).

The Complaint is replete with allegations that explain Compass did not know and could not have reasonably known of Appellees' actions in 2014 or 2016 and ultimately did not learn of such actions until January 2020. For example:

- "*Unbeknownst to Compass* . . . Flywheel has competed with Compass . . . by misusing stolen trade secrets and proprietary information . . . . Defendants DiPaula, Miller, [Michael, and Daniel] have conspired to *conceal their misappropriation and cover up their actionable misconduct*. . . ." JA16, ¶ 1.

- "From its inception, *though unbeknownst to Compass*, Flywheel conspired to compete unfairly, both by using Compass's *secretly stolen* intellectual property, *while concealing the fraud* . . . ." JA18, ¶ 7.

- "*On January 20, 2020* . . . Compass's Controller located on the internet a Flywheel-branded Power Point presentation created by Patrick Miller that revealed, *for the first time*, that Flywheel had stolen and was continuing to misuse for unauthorized purposes Compass's trade secrets and proprietary business know how." JA19-20, ¶ 11.

16

Figure 15 – Compass Mktg., Inc., No. 23-1324 (4th Cir.) (Appellant's Br.).

USCA4 Appeal: 23-1324     Doc: 46     Filed: 09/11/2023     Pg: 11 of 37

Compass cannot be found to have made an informed, conscious choice based on the conversation between John and Daniel.

Nor can one conclude from the face of the Complaint that Compass would have discovered the trade secret misappropriation from any investigation in 2014 (especially where Compass alleged it did not uncover such theft until 2020 during its investigation of the White Defendants' other misconduct). *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 446 (2000) (limiting inquiry notice to "an investigation which . . . would have led to *knowledge of the alleged tort*.'") (emphasis added). Compass alleged it discovered the Digital Grocery Presentation after January 20, 2020, which revealed the misappropriation of trade secrets in November 2015. JA19-20. This had not even occurred in 2014, making it impossible to discover at that time. As the Complaint reflects, to this day and until discovery is conducted, Compass still does not know exactly when or how DiPaula and Miller initially misappropriated the trade secrets at issue. *See, e.g.*, JA59 ¶ 189; 42 ¶ 85.

Figure 16 - Compass Mktg., Inc., No. 23-1324 (4th Cir.) (Appellant's Br.).

30

Lastly, perhaps most telling, is the district court's finding that "Compass' argument that it could not discover the trade secret misappropriation until 2020 *strains credulity*" in part because "[t]he Profitero blog post [Compass] *allegedly*

23

*found* in 2020 was posted online in 2015." JA288 (emphasis added).[5]  These characterizations by the district court are the antithesis of accepting all factual allegations in the Complaint as true and drawing all reasonable inferences in favor of Compass. *See DIRECTV, LLC,* 846 F.3d at 765; *see also Anderson,* 155 F.3d at 505. Instead, they reflect credibility determinations the court made against Compass as well as a factual determination about whether a search should have taken place and what it may or may not have found.

Beyond this improper credibility determination, questions of fact abound. Numerous questions must be answered for the statute of limitations to be evaluated

30

with respect to the Flywheel Defendants, none of which "clearly appear on the face of the complaint," *Goodman,* 494 F.3d at 464, including:

Figure 17 - Compass Mktg., Inc., No. 23-1324 (4th Cir.) (Appellant's Br.).

31

When the issue of inquiry notice requires credibility determinations and questions of fact, such determinations and questions "are to be decided by the jury." *O'Hara*, 305 Md. at 301. Here, there is a litany of issues that can be decided only by a trier of fact after discovery. One of the most obvious examples is where the district court expressly determined Compass's allegation of discovering the trade secret claims in January 2020 was not credible. The district court was required to accept Compass's allegations as true and draw all inferences in its favor. Even at the summary judgment stage the court would be precluded from making such a credibility determination. *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("It is not our job [at summary judgment] to weigh the evidence . . . or to disregard stories that seem hard to believe.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Only the trier of fact can make such a credibility determination.

Beyond this improper credibility determination, questions of fact abound. Numerous questions must be answered for the statute of limitations to be evaluated

30

Figure 18 - Compass Mktg., Inc., No. 23-1324 (4th Cir.) (Appellant's Br.).

32

2.    THE 2015 PRESENTATION DID NOT PUT COMPASS ON INQUIRY NOTICE OF TRADE SECRET THEFT

Pointing to Miller's article and presentation, the Flywheel Defendants claim that, based on DiPaula's and Miller's departures and "with the knowledge it was already losing clients," Compass was "bound [in 2015] to investigate its former employees-turned-competitors, including at the very least by reviewing publicly available information about Flywheel." ECF 39 at 21-22. It is unclear from the face of the Complaint, however, when or how the article or presentation first became available online. From the Complaint, one only knows they were not discovered by Compass until January 2020. To infer they were available earlier is to draw an improper inference against Compass.

Figure 19 – Compass Mktg., Inc., No. 23-1324 (4th Cir.) (Appellant's Br.).

Noting that the DTSA and RICO claims against the Flywheel Defendants
were premised on the misappropriation of trade secrets, the district court found that
Compass knew or should have known of such claims in late 2014 when two
employees left Compass or, alternatively, when several eCommerce department
employees left in late 2016, *see* JA286-288, despite Compass expressly alleging how
it first discovered the misappropriation in January 2020 (just over two years before
it filed the Complaint). *See, e.g.,* JA60, ¶ 191. Finding that Compass's allegation
of discovering the misappropriation in January 2020 "strains credulity," the district
court made credibility determinations against Compass. JA288. The court further
disbelieved and drew inferences against Compass by finding it was "implausible"
Compass did not notice or investigate the loss of certain clients "in real time."
JA289. Without explaining how such a conclusion was clear from the face of the
Complaint, the district court found that, "[i]f Compass exercised reasonable
diligence, it would have found [a] publicly accessible article . . . much sooner" and
"where [its] clients went and whether Flywheel could be using its proprietary
information to 'poach' those clients." JA288-289. Moreover, the district court

Figure 20 - Compass Mktg., Inc., No. 23-1324 (4th Cir.) (Appellant's Br.).

### John and Mr. Stern Bring BSRICO to Anne Arundel County Circuit Court
*(Compass Marketing, Inc. v. Daniel White, et al., C-02-CV-25-000601)*

After Chief Judge Russell's dismissal of the federal BSRICO, John and Mr. Stern

immediately filed an illegitimate copycat in this Court on March 27, 2023, [18] where they

again dishonestly repeated the two critical pillars of their contrived BSRICO conspiracy –

Movant's embezzlement and "secret" investment in Flywheel, and Mr. DiPaula's and Mr.

Miller's theft of a fictional Compass "trade secret".

Despite Chief Judge Russell's finding that their claims "strain credulity," and

while still advancing those false assertions before the Fourth Circuit, John and Mr. Stern

refiled the same baseless BSRICO allegations in this Court. Undeterred by both the

federal trial and appellate court's rejection, indifferent to the burden placed on former

defendants and judicial resources, unconcerned about this Court's responsibilities, and

believing themselves beyond consequence, they simply recast their prior misconduct as

outside Maryland's reach and restarted the litigation here. *(Figure 20)*.

> " Fernandez engaged in further research and located a Flywheel-branded Power
> Point presentation ... that Miller purportedly gave at the Online & Digital
> Grocery Summit USA on or about November 15, 2015 ("the Digital Grocery
> Presentation"). ... Although the presentation may have been given in 2015 to a
> limited, paid audience, on information and belief, the presentation was not public
> before 2020 when it was discovered." *Compass Marketing, Inc. v. Daniel White,
> et al.*, No. C-02-CV-23-0000601 (Anne Arundel Cnty. Cir. Ct. Mar. 27, 2023)
> (Compl. pp. 48–49). *(Figure 21)*.
>
> "Fernandez gave the article and the Digital Grocery Presentation to John White,
> who immediately recognized the clients ... and John further recognized the
> contents of the Digital Grocery Presentation as content that could only have been

---

[18] *Compass Marketing, Inc. v. Daniel J. White, et al.*, No. C-02-CV-23-000601 (Md. Cir. Ct.
Anne Arundel County Mar. 27, 2023) (Complaint).

generated with the knowledge of Compass trade secret information and proprietary business know-how. The Digital Grocery Presentation revealed that Flywheel, DiPaula, and Miller were in possession of the more comprehensive repository of Compass trade secrets, the eCommerce Guide. The Digital Grocery Presentation included key pieces of information that could only be known from the original Compass eCommerce Guide." *Compass v. Daniel White, et al.*, (Compl. pp. 48–49). (*Figure 21*).

215.   Fernandez engaged in further research and located a Flywheel-branded Power Point presentation and voiceover that Miller purportedly gave at the Online & Digital Grocery Summit

---

[1] https://www.profitero.com/2015/03/the-future-of-amazon-fresh/

48

USA on or about November 5, 2015 ("the Digital Grocery Presentation"). Miller's introduction included a review of his clients: P&G, J&J, Mars, McCormick, Perrero, 5 Hour Energy, and Colgate. All of of these companies were Compass clients or former Compass clients. Although the presentation may have been given in 2015 to a limited, paid audience, on information and belief, the presentation was not public before 2020 when it was discovered.

216.   Fernandez gave the article and the Digital Grocery Presentation to John White, who immediately recognized the clients Miller claimed were Flywheels as they were Compass clients, and John further recognized the contents of the Digital Grocery Presentation as content that could only have been generated with knowledge of Compass' trade secret information and proprietary business know-how. The Digital Grocery Presentation revealed that Flywheel, DiPaula, and Miller were in possession of the more comprehensive repository of Compass trade secrets, the eCommerce Guide. The Digital Grocery Presentation included key pieces of information that could only be known from the original Compass eCommerce Guide.

Figure 21 – "Original" BSRICO: Compass Mktg., Inc. v. White, No. C-02-CV-23-000601 (Md. Cir. Ct. Mar. 27, 2023) (complaint).

36

## John and SLG Bring Annapolis City and Police Department Into the "Conspiracy"
### (The Kidnapping Hoax)

On November 30, 2022, after the former defendants refused to pay his ransom and it became apparent Chief Judge Russell was not accepting the BSRICO allegations, John accelerated his conduct. Accompanied by his "bodyguard", former Sheriff Ron Bateman, John fabricated an assassination / kidnapping hoax, falsely implicating Movant and the other former defendants, and stating the attempted "hit" was connected to the BSRICO lawsuits—even improperly invoking Mr. Rosenstein's name in the process. (*Figure 22*).

> *"Given the timing of the very unusual litigation in VA filed a couple weeks ago (you didn't ask us but that is very unusual) and the additional litigation in Federal Court filed by the former Attorney General of the United States Rod Rosenstein, where a decision is soon expected … I am in parallel the victim of a $400 million theft that is public … obviously you understand we will continue to investigate."* Email from John White to Annapolis Police Detective Megan Ross (Dec. 5, 2022). (*Figure 22*).

Even with former Sheriff Bateman's encouragment, the Annapolis Police refused to initiate a kidnapping investigation to bolster John's failing BSRICO narrative. Undeterred, John and Mr. Stern expanded their conspiracy theory to accuse the Annapolis Police Department, its Public Information Officer, and the City itself of participating in a $24 billion "trade secret theft" supposedly committed more than a decade earlier. When neither the phony kidnapping report nor a Maryland PIA complaint produced results, John escalated further—personally swearing out a criminal complaint before a Judicial Commissioner falsely accusing the Annapolis Police PIO, Miguel Dennis, of a criminal COMAR violation. [Exhibit 3].

Case 1:21-cv-00309-ELH     Document 269-3     Filed 05/21/24     Page 8 of 15

From: John White <jwhitecompass16@gmail.com>
Date: Mon, Dec 5, 2022 at 14:45
Subject: Re: Update on our case
To: Megan Ross <mrross@annapolis.gov>
CC: Chuck Rubac <chuck.rubac@gmail.com>, Ron Bateman <rbateman655@gmail.com>

Officer Ross,

Thank you for this information.

While I understand you will not be able to invest more time into this matter given the lack of evidence of any crime you have been able to secure, obviously you understand we will continue to investigate.

Given the timing of the very unusual litigation in VA filed a couple weeks ago (you didn't ask us but that is very unusual) and the additional litigation in Federal Court filed by the former Attorney General of the United States Rod Rosenstein, where a decision is soon expected, we are taking serious this situation. While we hope it was just suspicious activity as you have conclude, I am in parallel the victim of a $400 million theft that is public, so hopefully you will understand if we continue to chase down the leads.

Figure 22 - $400 Million Theft "in Federal Court" … "Filed by the former Attorney General of the United States Rod Rosenstein"

<u>Sanctions Are Necessary and Appropriate</u>

For seven years, John White and Mr. Stern have used this Court, and others, as instruments of retaliation and coercion. They filed and maintained five iterations of the baseless "BSRICO" conspiracy, each callously expanding the list of victims and built upon fabrications they knew were false—namely, the fictitious "secret Flywheel investment" and the fabricated "trade secret theft." They repeated those falsehoods in federal court, in this Court, and before the Fourth Circuit, even after Chief Judge Russell found their claims "strain credulity" and dismissed them without leave to amend. The

38

Fourth Circuit also found their claims to be unbelievable. Rather than accept that ruling,

John and Mr. Stern refiled the same allegations here and expanded their accusations to

include additional innocent parties.

In more than twenty years as a trial lawyer, Movant has never been sanctioned,

never been held in contempt, or been reported to Bar Counsel - prior to this case. Movant

has never in his career sought sanctions or contempt against any opposing attorney or

party. By contrast, John and Mr. Stern have repeatedly attempted to weaponize the

judicial system. In the *Boshea* matter they went so far as to ask the federal court to find

Movant in contempt, impose sanctions, and incarcerate Movant. (Figure 23). [Exhibit 4].

---

Case 1:21-cv-00309-ELH    Document 64    Filed 11/03/21    Page 12 of 14

(or such other time that Compass Marketing is willing to conduct the deposition).[16] In addition,

daily monetary penalties should be imposed on Daniel White until complete compliance is

achieved.

    This is a case that calls for severe remedial measures, not only because Daniel White has

repeatedly refused to comply with a valid subpoena and this Court's Order enforcing that

subpoena, but also because Daniel White is a prosecutor[17] and he should know better. The

effectiveness of our judicial system requires respect for its procedures and compliance with its

orders. To allow a prosecuting attorney to disregard those procedures and this Court's Order

without severe remedies would send an alarming message to the citizens of the State of Maryland,

implying that a prosecutor receives "special treatment" or is otherwise "above the law" and it could

lead to further disregard for judicial procedures and this Court's orders. As a result, this Court

should consider imposing not only the remedies noted above, but also coercive incarceration. *See,*

*e.g., Enovative Techs., LLC v. Leor*, 110 F. Supp. 3d 633, 637 (D. Md. 2015) ("Incarceration . . .

is proper upon a finding of civil contempt as long as the purpose is to coerce compliance . . . rather

than to punish.").

---

*Figure 23 – Mr. Stern's Contempt Motion Against Movant (November 3, 2021)*

39

Movant has never weaponized sanctions; Mr. Stern has. Sanctions are not requested lightly. But here, the record demonstrates a sustained, intentional misuse of the judicial process: knowingly false pleadings alleging a fabricated investment and trade secret theft; manipulation and separation of evidence, including detaching the cashier's check from the explanatory email Movant sent on October 15, 2015; refiling dismissed claims in another forum despite adverse rulings and lack of jurisdiction; attempts to instigate criminal prosecution and fabricate a kidnapping hoax when civil courts rejected their theories; and efforts to have Movant jailed for contempt, even though he had never previously been sanctioned or held in contempt in any court. This conduct is not mere error, it is deliberate, vexatious, and undertaken in bad faith. It has consumed judicial resources, inflicted enormous financial and personal harm on Movant and other former defendants, and undermined the integrity and dignity of this Court.

Conclusion

John and Mr. Stern's latest filing is nothing more than an attempt to escape accountability for a seven–year campaign of fabricated litigation, manufactured "evidence," and weaponized court filings. John now claims to be a "non-party," and Mr. Stern claims to be a "nullity", as though they did not personally draft the first BSRICO complaint, hire counsel to sign it, fund it, direct the false statements made to this Court, federal courts, law enforcement, and the press, and continue prosecuting it after every allegation was proven false. This Court is not confronting a routine dispute—it is confronting deliberate abuse of judicial process. The record shows: (1) five versions of a

knowingly false $24 billion RICO conspiracy; (2) falsification and separation of documents to defeat a statute of limitations; (3) repeated misrepresentations to federal and state courts, appellate courts, law enforcement, and regulatory bodies; (4) a fabricated kidnapping narrative when courts rejected their claims; and (5) now, a baseless effort to strike sanctions rather than answer for their conduct. Even now, in their most recent filings, John and Mr. Stern once again ask for sanctions *against Movant.* That is the measure of their bad faith, and the measure of restraint Movant has shown until now.

This Court has both the authority and the obligation to respond. Maryland Rule 1-341 exists to address exactly this: litigation pursued in bad faith, especially when it is used as a tool of retaliation, extortion, and public defamation. Such conduct cannot be excused as advocacy, and it cannot be allowed to stand. For these reasons, Movant respectfully asks this Court to: 1) deny Respondent's Motion to Strike; 2) Grant Movant's Motion for Sanctions; 3) Make findings under Md. Rule 1-341 that the litigation was filed and maintained in bad faith and without substantial justification; and 4) Impose appropriate relief, including attorneys' fees, costs, and referral to the Attorney Grievance Commission. Anything less would signal that this Court may be used as a weapon without consequence. The rule of law demands otherwise.

Movant therefore respectfully requests that the Court:

1. Make a finding under Md. Rule 1-341 that John White and Mr. Stern acted in bad faith and further that any counsel who signed or advocated these pleadings acted without substantial justification;

41

2. Order Respondents to pay Movant's reasonable attorneys' fees and costs incurred in this case;

3. Consider referral to the Attorney Grievance Commission with respect to any attorney who knowingly advanced falsified allegations or evidence; and

4. Grant such other relief as the Court deems just, including issuing appropriate protective orders.


Movant appreciates the Court's recognition of the extraordinary circumstances of this case and its decision to halt the endless cycle of trial extensions. Yet the situation is akin to Respondents having burned down Movant's house: while everyone escaped and the flames have been extinguished, Movant alone now faces the burden of rebuilding—solely as a result of Respondents' greed and egregious misconduct. This pattern of abuse cannot be left unaddressed. As the Supreme Court has made clear, courts have both inherent authority and the obligation to curb litigation conducted in bad faith to protect the integrity of judicial proceedings. This is that case.


Respectfully submitted,

Daniel J White
Post Office Box 1760
Leonardtown, MD 20650
240-298-8156
danieljwhite@msn.com

42

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day November 7, 2025, a copy of the foregoing Reply to Motion to Strike Sanctions and Attachments and Proposed Order was mailed or electronically served upon all counsel of record and parties entitled to service.

Daniel White

43

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ASHLEY BOSHEA, as Administrator of the Estate of
DAVID JOHN BOSHEA

Plaintiff

v.                                                  Civil Action No. 1:21-cv-00309-ELH

COMPASS MARKETING, INC.

Defendant

### MICHAEL WHITE'S REPLY TO "COMPASS MARKETING, INC.'S" OPPOSITION TO MOTION FOR RECONSIDERATION

Movant, Michael White, respectfully submits this Reply to the Opposition (ECF 388)

filed in the name of Compass Marketing, Inc. ("Compass"), and states as follows:

Clarification Regarding "Compass".

1. For convenience only, Movant uses the term "Compass" to refer to John White and

   Stephen Stern, who have filed pleadings purporting to act on behalf of Compass

   Marketing, Inc. Movant maintains that neither individual possesses lawful corporate

   authority or shareholder authorization to represent Compass, a distinction that is material

   to the questions presented on reconsideration.

Admission Concerning John White's Resignation.

2. Footnote 2 of Compass's Opposition acknowledges that "John White did step down as

   CEO of Compass Marketing temporarily," and asserts that this fact "was explained to the

   Court," although the record does not show that it was ever clearly presented. That

   acknowledgment confirms that John White resigned as Chief Executive Officer, and

   Movant and Daniel White have consistently maintained with this Court since 2021 that,

1

absent a shareholder vote or other lawful corporate action reinstating him, he lacked authority to act on behalf of the corporation.

3. Under Maryland and Virginia corporate law, an individual may resign unilaterally but cannot unilaterally resume an executive office or bind a corporation without proper corporate authorization.

4. In light of Compass's concession, Movant respectfully requests that, at a minimum, the Court direct Compass and John White to identify with specificity: (i) the exact date and circumstances of John White's resignation as CEO; (ii) the legal basis on which he asserts that he "remained Chairman" during the period of his resignation, including how that assertion can be reconciled with the Virginia State Corporation Commission filings submitted by John White that reflect only "Owner", not CEO or Chairman; and (iii) the date, manner, and corporate authority by which he contends he "resumed his role as CEO," together with any corporate records, minutes, resolutions, or other evidence supporting that contention. Absent such a showing, there is no competent evidentiary basis on which the Court can find that John White possessed lawful corporate authority to act for Compass during the periods relevant to this litigation.

Shareholder Ownership and Control Resolved in Anne Arundel County.

5. In Compass Marketing, Inc. v. Daniel White, et al., Case No. C-02-CV-23-000601 (Cir. Ct. Anne Arundel Cnty. Mar. 27, 2023), "Compass" (John White) filed a complaint ("SAC") that placed shareholder ownership percentages and corporate control at the center of its claims. The SAC alleged that Compass was a closely held corporation whose voting control and governance rested with John White, while Michael White and Daniel

2

White were alleged minority shareholders whose interests and authority were
substantially subordinate to his.

6.  The SAC asserted that Michael White and Daniel White each claimed to own twenty-five
    percent (25%) of Compass Marketing, Inc., but that Compass's internal records reflected
    that each owned only sixteen percent (16%) of the company, with John White alleged to
    own sixty-eight percent (68%). The pleading framed this asserted ownership allocation as
    the basis for alleging that John White possessed majority voting control and the sole
    ability to direct corporate affairs, including decisions about management, employment,
    and the initiation or defense of litigation in Compass's name.

7.  The SAC further alleged that, despite their purported minority ownership positions,
    Michael White and Daniel White attempted to interfere with Compass's business
    operations and asserted that they had equal control or voting authority with John White.
    In multiple counts, Compass claimed that Michael White and Daniel White wrongfully
    held themselves out as possessing equal or controlling authority, purportedly acted
    contrary to John White's decisions as alleged majority shareholder, and sought to obstruct
    or usurp corporate governance by contesting his claimed 68% interest and his asserted
    role as "Chairman/CEO."

8.  Beyond the ownership percentages, the SAC alleged, among other things, that the
    asserted 68%–16%–16% allocation was reflected in Compass's "corporate records,"
    which were said to confirm both John White's majority interest and Michael White and
    Daniel White's minority status.

3

9. On the allegation of those records, Compass claimed that John White alone had the right to determine corporate policy, employ or terminate officers and employees, and authorize the institution or maintenance of litigation on Compass's behalf.

10. Michael White and Daniel White allegedly ignored or repudiated that structure by representing to third parties and courts that they had equal voting authority, including in disputes over who could lawfully act as Compass's corporate representative.

11. These allegations were expressly tied to Compass's causes of action, which sought, among other relief, judicial confirmation of the alleged ownership percentages, declarations regarding which individuals possessed authority to act for Compass, and remedies based on the premise that Michael White and Daniel White were minority shareholders without equal or controlling rights. The SAC used these ownership assertions to support theories of breach, interference, and purported unauthorized acts by Michael White and Daniel White, repeatedly invoking John White's alleged 68% control as the foundation for Compass's claims of corporate authority.

12. All of Compass's claims and allegations in that action, including those concerning ownership percentages and governance authority, have now been resolved in favor of Daniel White and Michael White. On August 25, 2025, the Circuit Court entered an order directing that final judgment be entered in favor of Defendant Daniel White on all counts asserted against him by Compass Marketing, Inc., and that the order be entered and recorded on the docket. Under Maryland preclusion law, such a judgment constitutes a final adjudication on the merits and is entitled to res judicata effect in subsequent proceedings.

4

13. On August 7, 2025, Compass and counsel for Michael White filed a Stipulation of Dismissal With Prejudice as to the claims Compass had asserted against them, expressly preserving the defendants' right to seek sanctions. The stipulation was executed by all parties pursuant to Maryland Rule 2-506 and, together with the final judgment for Daniel White, fully disposed of Compass's claims against Michael White on the merits.

14. By operation of Maryland preclusion principles and 28 U.S.C. § 1738 [1], these final state-court dispositions foreclose Compass from re-asserting in this Court the same ownership and authority theories that were advanced in the SAC—namely, the allegation that John White holds 68% of the shares, that Michael and Daniel White each hold only 16%, that they lack equal voting or governance authority, and that John White thereby possesses unilateral power to direct Compass's affairs and litigation. The ownership and control narrative set out in Exhibit A has already been litigated to conclusion in state court, with final judgments that must be given full faith and credit here, and Compass may not now rely on that rejected ownership story to justify purported authority in this federal proceeding.

---

[1] TITLE 28—JUDICIARY AND JUDICIAL PROCEDURE §1738. State and Territorial statutes and judicial proceedings; full faith and credit - The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto. The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form. Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken. (June 25, 1948, ch. 646, 62 Stat. 947.)

15. Full Faith and Credit to Maryland Judgments. Under 28 U.S.C. § 1738, federal courts must give the judicial proceedings of any state the same full faith and credit they would receive in the courts of that state. Federal courts, including the Supreme Court, have repeatedly held that § 1738 obligates federal courts to apply the preclusion law of the rendering state when determining the effect of a state-court judgment.

16. The District of Maryland has applied these principles in holding that Maryland state-court decisions must be given the same preclusive effect in federal court that they would receive in Maryland courts. The Anne Arundel County judgments must therefore be accorded in this Court the same res judicata effect they have under Maryland law, precluding relitigation of ownership and corporate-authority issues already resolved in favor of Michael White and Daniel White.

17. Read together with § 1738, these authorities require this Court to give the August 7 and August 25, 2025 Maryland orders the same claim-preclusive effect they would have in Maryland, barring Compass from reasserting ownership or authority theories already adjudicated or dismissed with prejudice.

Matters "None of Which Is in Dispute".

18. The Opposition's assertion in Footnote 2 of their Opposition that the ownership and authority issues are "none of which is in dispute" is incorrect. Those issues have been actively contested since 2018 and, under 28 U.S.C. § 1738 and Maryland preclusion law, were conclusively resolved in the Anne Arundel County proceedings, which are entitled to full faith and credit in this Court.

19. Incomplete Context for the Court's Prior Ruling. The Court's October 30, 2025, Memorandum Opinion was issued without the complete context recently admitted by

6

Compass that john White was not the CEO and that the title "Chairman" is not a statutory

corporate office in either Maryland or Virginia and does not, standing alone, confer

authority to act for a corporation. The current record demonstrates that (1) John White

resigned as CEO; (2) no board or shareholder action reinstated him; (3) filings with the

Virginia State Corporation Commission identify him only as "Owner"; and (4) the Anne

Arundel County judgments resolved ownership and representation issues in favor of

Movant and Daniel White.

20. Maryland Law on Corporate Authority. Under the Maryland General Corporation Law,

corporate powers are exercised by or under the authority of the board of directors, and the

statute allocates authority through required and permitted officers rather than through the

title of "chairman." The Corporations and Associations Article authorizes the board to

create executive and other committees and to delegate powers to them, confirming that

authority flows from the board's collective action and delegation, not from an individual

director's title.

21. Maryland practice materials on governance and derivative actions emphasize that

decisions relating to litigation, corporate control, and major transactions must be taken by

the board or its properly authorized agents, and that non-statutory titles such as

"chairman" do not, by themselves, create unilateral authority to bind the corporation.

Accordingly, the mere post hac self-designation of John White as "Chairman" did not

reinstate his authority to act as an officer or to appear for the corporation absent valid

corporate action.

22. Virginia Law on Corporate Authority. The Virginia Stock Corporation Act similarly

provides that all corporate powers are to be exercised by or under the authority of the

7

board of directors, and that the business and affairs of the corporation are managed under the direction and subject to the oversight of the board. The statute requires a board of directors and establishes that board, not a single director or chairman, as the locus of corporate authority.

23. Virginia law permits the board to establish committees and delegate certain powers, again reinforcing that authority derives from board action and delegation, subject to statutory limits. Commentary on corporate authority and signing powers under Virginia law explains that authority to bind the corporation ordinarily lies with duly authorized officers or agents and that a title such as "chairman" does not by itself confer unilateral power to contract for or represent the corporation. Thus, under Virginia law as under Maryland law, a self-designated "chairman" cannot unilaterally assume executive authority or bind the corporation without proper board authorization.

24. Counsel Withdrawals and Representation Status. Although Mr. Stern has repeatedly asserted that he has not represented Compass for "more than one year," filings in the Anne Arundel action reflect continued involvement beyond that period, including time entries reflected in invoices produced in subsequent fee litigation brought by former co-counsel Joyce E. Smithey, Esq. seeking approximately $448,000 in fees [2]. Ms. Smithey later withdrew after the state court granted her emergency motion to withdraw for ethical reasons, and an "expert witness" retained by Compass during that engagement, separately seeks approximately $190,000 in unpaid fees [3].

---

[2] Smithey Law Group LLC v Compass Marketing, Inc., Case No. C-02-CV-25-003479 (Cir. Ct. Anne Arundel Cnty. Dec. 6, 2025).

[3] Vallit Advisors, LLC v Compass Marketing, Inc., Case No. C-02-CV-25-003290 (Cir. Ct. Anne Arundel Cnty. Nov. 14, 2025).

8

25. Compass presently has no active counsel of record in those matters, and John White has publicly and repeatedly characterized himself as a "non-party," leaving Compass without any corporate representation in those cases.

26. The Third-Party Complaint. Movant was named by Compass in a Third-Party Complaint filed while Mr. Stern represented Compass, which was later dismissed. That pleading lacked factual support and has no continuing legal relevance, and the timing of its filing coincided with efforts to align this case with other litigation involving Flywheel Digital LLC, in which individuals associated with Smart Retail, Inc., including its Chief Financial Officer, appeared in court proceedings as purported corporate representatives of Compass.

27. Footnote 5 – Smart Retail, Inc. Compass's footnote 5 contends that Michael White "has no basis" to assert that attorney Stephen Stern held any financial interest in Smart Retail, Inc. ECF 269-1, Mr. Stern's May 28, 2019 conflict-disclosure letter, reflects that he disclosed a prospective shareholder interest of approximately one percent in Smart Retail without any capital contribution, and the same exhibit includes Smart Retail's Wyoming incorporation documents listing Mr. Stern's law partner as incorporator at the firm's Annapolis address. Those documents provide a documented basis for referencing Mr. Stern's prospective ownership interest and his firm's role in the company's formation and are relevant to the credibility of representations made in Compass's Opposition.

28. Footnote 6 – Allegations Concerning Mrs. White. Footnote 6 references earlier pleadings that contained allegations relating to Movant's spouse. While Mr. Stern did not sign the amended complaint that added her as a party, the employment-related allegations concerning her first appeared in pleadings prepared and signed by Mr. Stern during his

period of representation and were later adopted by successor counsel. Those allegations were dismissed by the Circuit Court prior to counsel's "emergency" withdrawal for ethical reasons, and the docket reflects that the allegations originated during Mr. Stern's supervision and were never sustained by any adjudicated findings. In fact, sanctions have been ordered against Compass and counsel for complete failure of discovery and further sanction motions are pending for continuing to pursue her as a defendant in that litigation after a safe-harbor demand that she be removed.

29. Request for Reconsideration. The current record, viewed in light of 28 U.S.C. § 1738, applicable federal rules, and governing Maryland and Virginia corporate law, establishes that: (1) John White resigned as CEO and was never reinstated; (2) the Anne Arundel County judgments and dismissals with prejudice constitute final adjudications on the merits that preclude re-litigation of ownership and corporate-authority issues in this Court; (3) under Maryland and Virginia statutes, all corporate powers are exercised by or under the authority of the board of directors, and the non-statutory title "Chairman" does not create unilateral authority to act for the corporation; and (4) material assertions in footnotes 4–6 of the Opposition are inconsistent with the documentary record.

For these reasons, Movant respectfully requests that the Court reconsider its prior ruling to correct the factual record and to prevent manifest injustice.

Respectfully submitted,

Michael R. White

39650 Hiawatha Circle
Mechanicsville, MD 20659
Email: michaelrwhite@comcast.net
Tel: (301) 481-5986
Dated: December 15, 2025

10

Exhibit Index

1. Second Amended Complaint (Anne Arundel County); ownership and governance allegations

2. Final Judgment for Daniel White (Aug. 25, 2025)

3. Stipulation of Dismissal for Michael White (Aug. 7, 2025)

4. Mr. Stern's Retainer Agreement and Smart Retail incorporation records

Certificate of Service

I hereby certify that on December 15, 2025, the foregoing Reply was served via Frist Class Mail on all counsel of record.

Michael R. White

LAW OFFICES
**KAGAN STERN MARINELLO & BEARD, LLC**
238 WEST STREET
ANNAPOLIS MARYLAND 21401
Telephone (410) 216-7900
Facsimile (410) 705-0836

STEPHEN B. STERN
(410) 793-1610

STERN@KAGANSTERN.COM
WWW.KAGANSTERN.COM

June 11, 2019

**VIA EMAIL**

John White, CEO
Smart Retail, Inc.
222 Severn Avenue
Suite 200
Annapolis, Maryland 21403

   **Re:    Conflict of Interest Disclosure**
John:

   As you know, you recently advised me that you are planning to form a new corporation called Smart Retail, Inc. ("Smart Retail"). Smart Retail will utilize radio frequency identification ("RFID") technology that will create new marketing opportunities for businesses, primarily by attaching to products (mostly in retail establishments) a label that contains a chip. You asked me and my firm to serve as outside counsel for Smart Retail to help the company address a number of legal issues. You later offered me the opportunity to become a minority shareholder in Smart Retail, with my initial ownership stake being at 1%. The opportunity to serve as outside counsel to Smart Retail and also become a shareholder is very exciting to me and I very much appreciate the opportunity to serve in both capacities. The dual role I am expected to have for Smart Retail, however, raises potential conflicts of interest under the Maryland Rules and, prior to proceeding any further, I believe it is necessary to disclose those potential conflicts to you in writing so that you fully understand them. If you feel comfortable proceeding with my dual role after disclosing these potential conflicts of interest, please indicate your consent by signing where indicated below in this letter.[1]

---

[1] We already discussed these issues by phone and you gave your verbal consent, but, pursuant to the Maryland Rules, it is necessary to address any actual or potential conflicts of interest in writing to avoid any misunderstandings and have your written consent in writing as well.

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 11, 2019
Page 2 of 6

Maryland Rule 19-301.8(a) states that an "attorney shall not enter into a business transaction with a client unless: (1) the transaction and terms on which the attorney acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client; (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek independent legal advice on the transaction; and (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the attorney's role in the transaction, including whether the attorney is representing the client in the transaction." I address each of these requirements below.

## Conflicts of Interest

After I sent you an engagement letter for me and my firm to serve as outside counsel on general business matters for Smart Retail,[2] you offered me the opportunity to become a shareholder in Smart Retail, with the initial opportunity to own 1% of the company.[3] The amount of the initial investment has yet to be determined.[4]

Initially, you asked me and my firm to help you form the company and draft the initial shareholder agreements. With me becoming one of the early investors in Smart Retail, that poses a potential (but waivable) conflict of interest, even though I am not going to be the attorney who actually performs the work of forming the corporation and

---

[2] The original engagement letter dated May 1, 2019 was for SRL, Inc., but you later decided to change the name to Smart Retail, Inc., which led me to send this revised conflict disclosure letter and a new engagement letter for Smart Retail.

[3] You have made a similar offer to own 1% of Smart Retail to some other individuals (approximately seven) who are employees of other companies you own and/or manage and/or advisors to you in some capacity.

[4] I asked you what amount you are seeking for 1% of the company, and you advised me that there is no particular number at this point because the initial distribution of stock to the individuals who will own 1% of the company is not intended to raise capital; it is intended to give a few individuals who have helped you get to this point with this business opportunity to become early stakeholders in this new venture that will be known as Smart Retail.

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 11, 2019
Page 3 of 6

drafting the initial documents, including the initial shareholder agreements.[5] The reason for the potential conflict is that either I or my colleagues could potentially take advantage of the position of trust we hold and draft one or more documents or otherwise give advice that is more favorable to me and potentially less favorable to you. I do not foresee a circumstance where I or my colleagues would engage in such conduct, but that risk does exist and must be disclosed to you.

You have since advised me that you may seek representation from Mitchell Goldsmith, of Taft Stettinius & Hollister, LLP, in connection with the formation of Smart Retail and drafting the initial documents, including the initial shareholder agreements, because you have worked with him for many years and you value his experience in drafting these sorts of documents and other corporate matters. If you were to use Mitchell Goldsmith and his firm instead of mine, that would eliminate any potential conflict of interest for me and my firm, at least with the initial formation of Smart Retail and the drafting of the initial shareholder agreements.[6]

Although referring these initial tasks to Mitchell Goldsmith and his firm instead of my firm would eliminate any potential conflict of interest for me and my firm with respect to those initial tasks, I do not believe that fully eliminates all potential conflicts of interest for me and my firm. In this regard, if Smart Retail goes through additional rounds of capital raising/seeking new investors, there is the potential for my interest in the company to be diluted, which could have a negative impact on the value of my interest in the company. The potential adverse effect on my interest in Smart Retail could potentially influence the advice I (or my colleagues) give you and the company. While I do not foresee a circumstance where my advice (or the advice of my colleagues) would be influenced by my interest in Smart Retail, it is possible and I would be remiss in failing to disclose that risk to you.

---

[5] I would refer that work to my partner, Ryan Beard. I am expected to assist on business contracts, employment issues, litigation (if litigation ever became necessary), and other risk management issues going forward.

[6] Regardless of which firm helps you form Smart Retail and drafts the initial documents (you also noted that you may use a combination of Mitchell's firm and my firm for these initial documents), including the initial shareholder agreements, the terms of the initial investment and shareholder agreement are expected to be in writing, which will further satisfy the requirements of Maryland Rule 19-301.8(a)(1).

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 11, 2019
Page 4 of 6

Another area where a potential conflict of interest may arise concerns my billing practices. In this regard, because I am going to be a shareholder in Smart Retail, you may ask for or expect potential discounts on my firm's invoices or, alternatively, I may be incentivized to offer discounts on invoices to advance my financial interest in Smart Retail. While I and my colleagues may occasionally offer courtesy discounts to clients for certain tasks performed or write off or otherwise discount fees that are not reasonable under the circumstances, I am not permitted to offer any discounts to Smart Retail beyond what I might otherwise offer in the ordinary course of business. Any discount beyond what might be offered in the ordinary course of business is prohibited because discounting invoices to Smart Retail in that manner would potentially benefit me (indirectly) as a shareholder of Smart Retail to the detriment of my law firm partners, which would violate duties I owe to my law firm partners. Thus, during the course of my firm's representation of Smart Retail, I cannot discount my firm's invoices in any way based on my role as a shareholder of Smart Retail.

As you know, as CEO of Compass Marketing, Inc. ("Compass"), and Tagnetics, Inc. ("Tagnetics"), you have retained me and my firm to represent Compass and Tagnetics in various capacities, including on advisory matters and litigation related matters. While I do not have any ownership interest in either Compass or Tagnetics, and I have not been offered the opportunity to become an investor in either company, my ownership interest in Smart Retail could potentially have an adverse effect on my representation of Compass and Tagnetics. In this regard, I could potentially give tasks performed for Compass or Tagnetics a lower priority than tasks that need to be performed for Compass or Tagnetics. I do not foresee a circumstance where I or my colleagues would act in such a manner. Nevertheless, I believe I am obligated to make this disclosure to you. In addition, for the reasons discussed above, I am not permitted to offer any discounts in legal fees to Compass or Tagnetics outside of what might be offered in the ordinary course of business as an indirect benefit to you for allowing me the opportunity to become an investor in Smart Retail.

Besides the potential conflicts of interest described above, other potential conflicts of interest may arise related to liquidity events concerning the shares I and other shareholders own in Smart Retail. In addition, potential conflicts of interest may arise in connection with the legal work you and I anticipate I will perform on behalf of Smart Retail. The precise contours of these potential conflicts are unclear at this time, as we do

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 11, 2019
Page 5 of 6

not know exactly what circumstances will arise and exactly what legal issues I will be
working on at a given time in the future. Nevertheless, I wanted to note these
possibilities to you in the interest of full disclosure. As we discussed, if there comes a
time where I am able to identify an actual or potential conflict of interest in connection
with a particular task/project I am asked or my firm is asked to perform on behalf of
Smart Retail (or even Compass or Tagnetics), I will disclose it to you as promptly as I
can and address it with you (and identify whether it is waivable or not).

### Seek Other/Independent Counsel

As you know, the potential conflicts of interest identified in this letter raise
important issues for you to consider so that you can be sure you are comfortable that your
interests (actually, the interests of Smart Retail and your other companies) are adequately
represented and not unfairly influenced by my anticipated financial interest in Smart
Retail. To this end, I must advise you that it may be in your interest to seek counsel other
than me to discuss the issues I have raised in this letter and help you evaluate the
potential conflicts of interest related to my anticipated ownership interest in Smart Retail.
While I can recommend attorneys to you, I know you know several attorneys with whom
you can consult (including, but not limited to, Mitchell Goldsmith). Nevertheless, if you
would like me to refer you to one or more other attorneys, please let me know.

### Informed Consent

If you conclude after reviewing this letter and/or seeking counsel from another
attorney with respect to the issues I have raised in this letter that I and my firm will fairly
and zealously represent Smart Retail (and Compass and Tagnetics), even when I am a
shareholder of Smart Retail, please sign where indicated below. By signing below, you
represent the following: (1) you believe you have been adequately informed of the actual
and potential conflicts of interest that exist with me being an investor in Smart Retail and
me and my firm serving as outside counsel to Smart Retail (and Compass and Tagnetics);
(2) you believe my firm and I will fairly and zealously represent Smart Retail (and
Compass and Tagnetics), even when I am a shareholder of Smart Retail; (3) you consent
to me and my firm serving as outside counsel to Smart Retail (and Compass and
Tagnetics); and (4) you consent to me being a shareholder in Smart Retail.[7]

---

[7] To ensure complete transparency in every respect, this letter has been reviewed by the
Managing Member of my law firm, Jonathan Kagan.

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 11, 2019
Page 6 of 6

If you have any questions, believe any the issues raised in this letter are not clear, or would like to discuss any of these issues further, please let me know. Of course, if you do not consent to all four of the foregoing items, please let me know and either I will not become a shareholder of Smart Retail or, if there is a concern that you believe can be remedied, we should discuss that potential remedy.

Very truly yours,

KAGAN STERN MARINELLO & BEARD, LLC

Stephen B. Stern

AGREED AND ACCEPTED:

By: _____        Dated: _____

    John White, individually and as
        CEO, Smart Retail, Inc.
        CEO, Compass Marketing, Inc.
        CEO, Tagnetics, Inc.

LAW OFFICES
## KAGAN STERN MARINELLO & BEARD, LLC
238 WEST STREET
ANNAPOLIS MARYLAND 21401
Telephone (410) 216-7900
Facsimile (410) 705-0836

STEPHEN B. STERN
(410) 793-1610
STERN@KAGANSTERN.COM

June 10, 2019

**VIA EMAIL**

John White, CEO
Smart Retail, Inc.
201 Chester Avenue
Annapolis, Maryland 21403

Re:    **Engagement Letter**

Dear John:

Thank you for choosing Kagan Stern Marinello & Beard, LLC (the "Firm" or "Kagan Stern") as your counsel. We appreciate the opportunity to be of assistance and, on a personal note, I look forward to working with you.

We apologize for the formality of this Agreement, but we believe that it is important that our clients have a clear understanding of the Firm's policies regarding legal services and fees from the inception of our relationship. Moreover, many of the provisions of this Engagement Letter (the "Agreement") are required or recommended by the law or the rules of professional conduct. The purpose of this Agreement is to verify your approval as to the scope of our engagement, the financial terms of our engagement, and other aspects of this engagement, as follows:

1.    Scope of Engagement. By means of this Agreement, you are engaging the Firm to perform only the following services: general business advice for your company, Smart Retail, Inc. ("Smart Retail"), as requested. Of course, subject to our mutual agreement, you also may engage us to perform additional services in the future. We will endeavor to keep you informed of the progress of your matter(s) and respond to your inquiries. On your part, you acknowledge the need to provide us with truthful and accurate information, and the need to cooperate and to keep us informed timely of any developments.

2.    Fees and Hourly Rates. Our billing practice is to charge for our legal services, based primarily on the amount of time, including travel time, devoted to a matter at hourly rates for the particular professionals involved. These hourly rates are based upon these professionals' experience, expertise, and standing. I will be primarily responsible for your representation and

KAGAN STERN MARINELLO & BEARD, LLC
ANNAPOLIS, MARYLAND

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 10, 2019
Page 2

my current hourly rate is $375.00. Other attorneys may provide assistance from time to time and their rates will vary. For example, hourly rates for associates who may assist in the representation of you currently range from $240.00 to $300.00. Other partner rates are also $375.00 per hour. Our current hourly charge for paralegals ranges from $110.00 to $150.00. Billing is in .10-hour increments. These rates are modified by us from time to time, and any new rates will be implemented immediately after they are adopted and will apply to legal services rendered after the effective date of the new rates. New rates will be reflected on your statement for services. We use associate and paralegal support on matters where appropriate, and we will be happy to discuss the staffing of your matter with you.

We charge for all activities undertaken in providing legal services to you under this Agreement, including, but not limited to, the following: conferences with you and with other attorneys working on this matter, including preparation and participation; preparation and review of correspondence and other documents; legal research; court and other appearances, including preparation and participation; and telephone calls, including calls with you, and other attorneys or persons involved with this matter.

3.    Additional Services and Outside Expenditures. We may provide additional services in-house in connection with our legal representation of you. These in-house additional services typically include document reproduction and imaging, litigation support services, electronic discovery services, computerized research, facsimile services, long distance telephone, postage, staff overtime, and miscellaneous expenses for mileage, meals, parking, lodging, and the like. Our practice is to bill these services to you directly at our usual and customary rates.

Our legal representation also may involve additional services provided by third party vendors outside the Firm. You will be required either to pay for these outside additional services directly, or to reimburse us if we make payment for these services on your behalf. We sometimes will make payment for, and then bill you for reimbursement of, smaller items such as filing fees, document reproduction and/or imaging by outside services, recording fees, messenger services, service of process, and court fees. When there are substantial expenditures involving outside vendors (such as litigation support services, electronic discovery services, depositions, expert witnesses, exhibit preparation, or air fare) or substantial out-of-pocket expenditures (such as extended travel expenses, large outside reproduction jobs, or jury fees), we will require either that you pay those sums to us before we expend them, that you provide an advance deposit for such expenditures, or that you directly contract with and pay the outside vendor.

4.    Monthly Statements and Payment Terms. Our practice is to send a monthly statement of our charges for legal services and in-house additional services rendered and for

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 10, 2019
Page 3

reimbursement of payments made on our client's behalf for outside additional services. The detail in the monthly statement will inform you of the nature and progress of our work and of the charges and expenditures being incurred.

Each monthly statement is fully due and payable upon receipt, but in no event later than thirty days after its issuance date. We reserve the right to charge, at the rate of ten per cent per year, a monthly late payment charge on the unpaid balance of any statement not timely paid in full, computed from thirty days after the statement issuance date until payment.

We specifically reserve the right to withdraw from representation of you and to cease performing immediately all services if we do not receive full payment of any amounts owed to us within thirty days of any statement.

We do our best to ensure that our clients are satisfied not only with our legal representation and services, but also with the reasonableness of our charges. Therefore, if you should have any question about a monthly statement, our services, or our charges, then you should raise it promptly for discussion. If you object to only a portion of the charges on a statement, then you agree to pay the remainder, which will not constitute a waiver of your objection.

5.    Advance Deposit for Payments. The Firm typically requires an advance deposit for payment of our charges for services and expenditures before being engaged as counsel or commencing any work on a matter. However, we will not ask for an advance deposit from you at this time.

If the scope of work that we are performing increases substantially beyond our original understanding, we reserve the right to require advance deposit(s). This is particularly, but not exclusively, true where litigation is involved. The amount of any deposit will be determined at the time when it becomes apparent to us that the scope of our work has increased or will increase substantially.

While we will attempt to obtain a favorable resolution of your matter, it may proceed to trial or other hearing. Preparing for and actually conducting the trial or other hearing of a matter are usually the most time-consuming services in any litigation engagement. We may require, therefore, that you provide us with an additional separate deposit prior to our commencement of preparation for trial or hearing to cover in advance a portion of our charges for these services and related expenditures. The amount of the deposit will be determined once the trial or other hearing appears inevitable and as soon as possible prior to the date the matter is set for trial or

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 10, 2019
Page 4

other hearing, based upon an estimate of the magnitude of services and expenditures that may be involved.

If you fail to provide an additional deposit within thirty (30) days after it is requested by us, we have the right to resign immediately from further representation of you.

6.      Withdrawal From Representation.  The attorney-client relationship is one of mutual trust and confidence.  If you have any questions at all about the provisions of this Agreement, we invite your inquiries.  We encourage our clients to inquire about any matter relating to our engagement agreements or monthly statements that may be in any way unclear or appear unsatisfactory.  If you do not meet your obligation of timely payments or deposits under this Agreement, we reserve the right to withdraw from your representation on that basis alone, subject of course to any required judicial, administrative, or other approvals.

This Agreement also is subject to termination by either party upon reasonable notice for any reason.  If there were to be such a termination, however, you would remain liable for all unpaid charges for services provided and expenditures advanced or incurred.

7.      Duties Upon Termination of Active Representation.  Upon termination of our active involvement in a particular matter for which we had previously been engaged, we will have no further duty to inform you of future developments or changes in law which may be relevant to such matter in which our representation has terminated.  Further, unless you and the Firm agree in writing to the contrary, we will have no obligation to monitor deadlines of any kind whatsoever that may arise from the matters for which we had been engaged.  If your matter involves obtaining a judgment and such judgment is obtained, we will only be responsible for those post-judgment services (such as recording abstracts, filing judgment liens, and calendaring renewals of judgments) as are expressly agreed to by you and the Firm in writing and for which you will be obligated to pay.

8.      Document Storage Policies.  Absent agreement to the contrary, the Firm's policy with regard to documents and other materials at the conclusion of a matter is to maintain them in storage for a minimum of seven years.  All documents and other materials in our file may then be destroyed or discarded without notice to you.  Accordingly, if there are any documents or other materials you wish to have retrieved from your file at the conclusion of a matter, it will be necessary for you to advise us promptly of that request to ensure that they are not destroyed.

9.      Consent to Electronic Communications.  In order to maximize efficiency in this matter, we intend to use communications devices to the fullest extent possible (*e.g.*, email,

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 10, 2019
Page 5

document transfer by computer, cellular telephones, PDAs and facsimile transfers). The use of such devices under current technology may place your confidences and privileges at risk. However, we believe the effectiveness involved in use of these devices outweighs the risk of accidental disclosure. By retaining the Firm as counsel, you consent to the use of these devices.

10.    Disclaimer of Guarantee. Nothing in this Agreement should be construed as a promise or guarantee about the outcome of any matter that we are handling on your behalf. Our comments about the outcome of your matter are expressions of opinion only. If we should provide you with an estimate of the fees and costs that may be incurred in connection with our representation of you, it is important for you to understand and acknowledge that any dollar amount is merely an estimate based on numerous assumptions which may or may not prove to be correct and that any estimate is not a guarantee or agreement of what the maximum amount of fees and/or costs will be.

11.    Entire Agreement. This Agreement contains all terms of the agreement applicable to our representation(s) of Smart Retail, Inc.

12.    Client. The Firm's client for the purpose of our representation is only the entity identified in this Agreement (*i.e.*, Smart Retail, Inc.). Unless expressly agreed, we are not undertaking the representation of any related or affiliated person or entity, nor any of their shareholders, partners, officers, directors, agents, or employees.

\*        \*        \*        \*        \*

If any terms of this Engagement Letter are incorrect or not satisfactory to you, please let us know immediately so that we can discuss the concerns you may have. Otherwise, please return an executed copy of this Agreement as soon as you are able to reflect your consent to these terms and your decision to retain Kagan Stern as your legal counsel.

KAGAN STERN MARINELLO & BEARD, LLC

John White, CEO
Smart Retail, Inc.
June 10, 2019
Page 6

     We look forward to working with you and thank you once again for the opportunity to be of service.

Very truly yours,

KAGAN STERN MARINELLO & BEARD, LLC

Stephen B. Stern

READ and AGREED:

_____

John White, CEO
Smart Retail, Inc.

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

COMPASS MARKETING, INC.                    *

      Plaintiff,                           *

v.                                          *        Case No. C-02-CV-23-000601

DANIEL WHITE, et al.,                       *

      Defendants.                         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### STIPULATION OF DISMISSAL WITH PREJUDICE FOR
### DEFENDANTS MICHAEL WHITE AND GEORGE WHITE

Plaintiff, Compass Marketing, Inc., and Defendants, Michael White and George White, by

undersigned counsel, pursuant to Md. Rule 2-506(a), hereby file this Stipulation of Dismissal With

Prejudice for Defendants Michael White and George White. Michael White and George White

expressly reserve all rights to seek sanctions, including without limitation, discovery sanctions

and/or sanctions pursuant to Rule 1-341 against Compass Marketing, Inc. and/or its counsel.

Compass Marketing, Inc. and/or its counsel reserve all rights to oppose such sanctions other than

with any argument that the Circuit Court no longer retains jurisdiction to address the request(s)

and/or that such request(s) are waived due to this Stipulation of Dismissal.

      Respectfully submitted,

      SMITHEY LAW GROUP LLC

      /s/ *Joyce E. Smithey*
      Joyce E. Smithey (AIS # 0406150286)
      Reuben W. Wolfson (AIS # 1212130309)
      David M.E. Moon (AIS # 1512160128)
      Liesel J. Schopler (AIS # 0712110174)
      706 Giddings Avenue, Suite 200
      Annapolis, Maryland 21401
      P: (410) 919-2990; F: (410) 280-1602
      joyce.smithey@smitheylaw.com
      reuben.wolfson@smitheylaw.com
      david.moon@smitheylaw.com
      liesel.schopler@smitheylaw.com
      *Counsel for Plaintiff*

STEIN SPERLING BENNETT DE JONG
DRISCOLL PC

_/s/ Judith G. Cornwell_ (by Joyce E. Smithey with
permission)
Jeffrey Schwaber, Esq. (AIS 8812160244)
Judith G. Cornwell, Esq. (AIS 1112130195)
1101 Wootton Parkway, Suite 700
Rockville, MD 20852
(301) 340-2020
jschwaber @ steinsperling.com
jcornwell @ steinsperling.com

*Counsel for Defendants, Michael White and George
White*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of August, 2025, the foregoing Stipulation of

Dismissal With Prejudice for Defendants Michael White and George White was served via the

Court's MDEC system on all counsel of record.

_/s/ Joyce E. Smithey_
Joyce E. Smithey

IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

COMPASS MARKETING, INC.                    *

    *Plaintiff*,                              *

    v.                                      *        Case No.: C-02-CV-23-000601

DANIEL WHITE, et al.                       *

    *Defendants.*                           *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### ORDER

Having received, reviewed, and accepted the Notice of Dismissal with Prejudice filed on August 14, 2025 by Plaintiff Compass Marketing, Inc., in the above-captioned action, voluntarily dismissing with prejudice all counts assessed against Defendant Daniel White, it is this 21ˢᵀ OAY OF August, hereby

ORDERED, that final judgment is hereby entered in favor of Defendant Daniel White on all counts asserted against him by Compass Marketing, Inc.

ORDERED, that this Order shall be entered and recorded on the docket.

_____
Hon Robert J. Thompson

civil filed 8/25/25 MD